# CHARLESTON.

## MEREDITH v. SHAKESPEARE

### Submitted February 5, 1924.    Decided April 8, 1924.

1. MARRIAGE—*Equity May Annul Marriages Entered Into in Spirit of Jest.*

   Courts of equity, independently of statutes relating to divorce and separation, have inherent power and jurisdiction to annul marriages entered into in the spirit of jest or joke with no intention of the parties of becoming husband and wife or of assuming the duties and obligations or of acquiring any of the rights pertaining to that status. (p. 244).

2.  SAME.—*That One Party to Marriage Entered Into in Spirit of
    Jest, Elects to Treat Marriage as Valid Does Not Deprive
    Other Party of Right to Annullment.*

    And the fact that one of the parties to such a marriage may
    afterwards elect to treat the marriage as valid and claim the
    benefits thereof, will not deprive the other party to the agree-
    ment of his or her right to have the marriage set aside and
    annulled.   (p. 244).

MEREDITH, PRESIDENT, absent.

Appeal from Circuit Court, Monongalia County.

Suit by Jamison Meredith, infant, etc., against Ann Vic-
toria Shakespeare.   From a decree for defendant, plaintiff
appeals.

*Reversed, and decree entered.*

*Terence D. Stewart* and *Glasscock & Glasscock,* for appel-
lant.

*C. William Cramer* and *Donley & Hatfield,* for appellee.

MILLER, JUDGE:

This suit is to annul the marriage between plaintiff and
defendant, occurring on August 14, 1922, as distinguished
from divorce, and upon grounds other than those specifically
mentioned in section 1 of chapter 64 of the Code, the juris-
diction and power thereby invoked being not that conferred
by the statute, but the inherent jurisdiction and power of
a court of equity with respect to all civil contracts, voidable
upon any ground cognizable by such courts.   That such in-
herent power and jurisdiction exists is settled law in this
state and elsewhere, and has been here declared and applied
in at least two cases of this character.   *Crouch* v. *Warten-
burg,* 86 W. Va. 664; and same case on final hearing, 91 W.
Va. 91.

In accordance with the rules and principles affirmed in
these cases and those cited from other states, the bill in this
case, as grounds for the relief prayed for, alleges that plain-
tiff is and was at the time of said marriage just past the
age of nineteen years, residing with his parents at Fairmont,
West Virginia, but then and for some time prior thereto, had
been attending the summer school of the West Virginia Uni-

versity, in the city of Morgantown, the marriage ceremony having been performed by a minister of the Methodist Episcopal Church in said city, designated as the student minister of said church; that the defendant then resided with her parents in said city of Morgantown, and was also an infant under the age of twenty-one years, namely, of the age of twenty years, and that the consent of the parents of neither of the parties had been obtained.

That while a marriage license was procured by him and defendant, and a ceremony was performed by said minister and a marriage certificate issued to them, a copy of which was exhibited with the bill, nevertheless, as alleged in the fourth paragraph thereof, the fact is that it was not the intention of either plaintiff or defendant, at the time said marriage ceremony was performed, to enter into a serious, valid and binding contract or status of marriage, but on the contrary that said ceremony was not to have any effect, and that the responses by them and each of them in said ceremony were to impose no matrimonial duties or obligations, or confer any matrimonial duties or obligations, or rights upon either of the parties; that it was then understood and agreed between them that the relation of husband and wife was not by said ceremony to be assumed, undertaken or contracted for; and that the marriage status should not thereby be created, and that there should be no consummation of the marriage.

And as showing the circumstances of said marriage, the bill alleges that said ceremony had its inception in a jest or joke and grew out of the excitement and exuberance of spirits attendant upon an automobile party in which plaintiff and defendant participated with several other intimate friends, immediately preceding the ceremony; that plaintiff had at no time any wish, desire or intention to become the husband of the defendant, nor had he any such wish, desire or intention since said ceremony was performed; and moreover, the bill further alleges that the defendant did not then have any wish, desire or intention to become the wife of the plaintiff, nor has she had any such wish, desire or intention since said ceremony was performed.

And, the bill further alleges that on the afternoon preceding the ceremony, and while on their automobile ride, and while passing an old and abandoned farm house along the road, plaintiff observing the house, but purely by way of jest, suggested to defendant that they return to town, get married and go back and live in the abandoned house; that while they had been acquaintances and friends for some time, yet neither had paid court or serious attentions to the other, and that what was said on that occasion was said in the hearing of all the members of the party, and was meant by him and regarded by all as a joke, and passed off as such; that the party proceeded on their way, and after a time came back to Morgantown and went to defendant's home, where they all danced and enjoyed themselves in that way for a time, and the suggestion of marriage was completely forgotten; that they later went down the street, and some one of the party, in a spirit of banter and jest again brought up the subject and demanded that they carry out the joke, and that plaintiff and defendant joining in the spirit thereof, with their young friends proceeded to obtain a marriage license and a ring, and in the highest of spirits and with great fun and laughter proceeded to the church, where the ceremony was performed; that during the whole of the ceremony the plaintiff considered the whole thing a huge joke, and that the defendant so considered it, winking at one of the members of the party while the ceremony was being performed, and otherwise treating the occasion as a matter of fun, as did their friends; that plaintiff had no idea or belief that the ceremony so performed would be binding upon him, nor did defendant in any sense believe it binding upon her; and that neither of them joined in said ceremony in earnest, but considered it wholly as a jest or joke.

And finally, to show the character of said marriage, the bill alleges that immediately upon the performance of the ceremony, plaintiff and defendant separated and have remained apart up to the present time; that they have never lived or cohabited together as husband and wife, nor is it their wish, desire or intention to do so; nor have they ever assumed towards each other the exercise of any of the rights

and duties, or obligations, pertaining to the marriage relation; nor have they ever acted towards each other as husband and wife; nor have they ever desired to do so; but that within a few hours after said ceremony was performed, they both consulted an attorney and sought his advice as to how to have said marriage annulled, they having been informed in the meantime that said marriage was binding until annulled by a decree of a court of equity; that on that occasion defendant as well as plaintiff stated to said attorney that said marriage was a matter of jest, and that they desired it annulled; and plaintiff alleges that it has been his earnest desire and intention ever since to live and remain separate and apart from defendant, and that he is informed and believes, and so charges, that such is the desire and intention of the defendant to live separate and apart from him, and to have the marriage annulled; and the prayer of the bill is in accordance with such desire and intention.

The answer of the defendant, while substantially admitting the circumstances of the marriage, and what was said and done on the automobile ride preceding the ceremony, attemps, at least, to put a very serious aspect upon the occurrences recited in the bill, and to put in issue the material allegations thereof. She alleges that the plaintiff seriously courted her for two or three years, and that prior to the marriage she had on his account declined the attention of numerous other young men, not named in her answer. She does not refer to any time or place where any proposal of marriage was made to her by plaintiff, except to say that on the day they returned from the automobile ride and at a drug store in Morgantown just before the marriage, plaintiff asked her to be his wife, and where and when she accepted, and that the ceremony was performed in accordance therewith, but with the understanding that the marriage was to be kept a secret until both plaintiff and she should complete their education, as planned. She denies that she does not wish to carry out the alleged marriage contract, or live with plaintiff and perform her marital duties as wife, but that on the contrary it is her earnest desire to do so. She alleges that she is without means of support, dependent on her

father and mother, and seeks by way of affirmative relief a decree for suit money, and alimony or support money.

In a special replication to this answer, plaintiff denies the allegation of the answer imputing to his father and mother any interference with, or effort on their part to keep plaintiff and defendant separate and apart; but that on the contrary they have simply participated in the efforts begun by both parties soon after the marriage to have it annulled, and in a conference between themselves and their parents they regarded it as the proper and wise thing to do to have the marriage annulled in the most expeditious and quiet manner possible; that it was agreed between all parties that suit was to be brought, and one was begun, on Friday after the marriage on Monday, in the name of the defendant against plaintiff in this suit, and a bill prepared by counsel employed or designated by defendant's father, in accordance with an agreement and understanding, process in which suit was served on plaintiff herein; but that soon after said suit was begun, it was withdrawn, and a new attitude assumed by defendant herein and her parents; and that their apparent purpose in this suit is to make it a money grabbing proposition, for they know that there is no possibility of plaintiff and defendant living together as husband and wife; that defendant has since said marriage, as always before, continued to live with her parents and to be supported by them, and there has been very little, if any, change in her habits and conduct.

The sufficiency of the bill was not challenged in the court below, nor has it been challenged here. The sole question then is, has the case presented by the bill been sustained by the proof? Had plaintiff and defendant, at or before the marriage ceremony, by words or acts, seriously entered into a marriage contract, with the intention of becoming husband and wife, and of assuming that relationship, with the rights, duties, privileges and obligations pertaining thereto? This, it seems to us is the sole question, for it is conceded that nothing has since then been done by either of the parties to ratify or confirm the marriage, or to change their previous status, or to estop them or preclude a court of equity from

doing equity, if there had not been in fact any prior contract binding upon them.

We can not undertake in this opinion to detail all the evidence bearing on the controlling question of fact in the case. Only the most potential facts can be covered. One of the most convincing facts is that there was no sincere courtship between the parties antedating the marriage ceremony. The plaintiff had been a student in the West Virginia University at Morgantown since September 1919. Just prior to that time he had been in a military school in Wisconsin, and before that in the public schools at Fairmont, residing all the time with his parents, either at Fairmont or at Charleston, West Virginia. Defendant during the previous year had been a student at a school in the city of Philadelphia. At the time of the marriage plaintiff was attending summer school at the University, and defendant was at home with her parents at Morgantown, spending her vacation, and intending to return to her school in Philadelphia in the fall. Not a line of correspondence between these two young people was produced in evidence, and the only evidence of any correspondence between them was that defendant while in Philadelphia had written a note to plaintiff, at Morgantown, not replied to by him, and the contents of which was not disclosed. Nor were there any telegraph or telephone messages exchanged between them during the whole period of their acquaintance, though they were separated in school and residence much of the time, with the exception of one or two telephone messages between Fairmont and Morgantown, relating to invitations to dances at Fairmont, accepted by defendant, some two years prior to the marriage, at one of which she was an invited guest at the home of plaintiff's parents for the night of the dance, and at the other she was the guest of a girl friend at Fairmont because of the impossibility of her getting back home until morning. When school closed early in June, 1922, he went to his home at Fairmont, and she remained at her home in Morgantown. He returned to school about July 28th; but from early in June to the last of July, a period of nearly two months, these parties were separated. - During this time there was not the

slightest communication between them of any kind or character, although only about twenty-five miles apart, in cities connected with every means of communication.

Plaintiff swears positively that he never proposed marriage to defendant at any time, nor thought of doing so, on the day of the marriage or at any time before or since; nor is there any testimony of any one that plaintiff ever proposed to defendant directly or indirectly to marry her, except what took place on the day of the marriage, when with two other young people they went on a joy ride in an automobile, as described in the bill. And the only contention now made by defendant in her testimony that any proposal was made to her was that on that day and before the wedding, at a drug store in Morgantown, plaintiff asked her to be his wife, which plaintiff emphatically denies. And we think the other facts and circumstances admitted by her are overwhelmingly against her on this proposition. The evidence does show that plaintiff was on a number of occasions in company with defendant as he had been on the day of the marriage, at dances and parties, or when a number of others were present; but there is very little evidence of any appreciable degree showing any affection or love for her, or of her love for him, except such as the exuberance, impulsiveness and indiscretions of youth may fully account for, among them one or two acts of osculation, which is emphasized by defendant and her counsel. The mother of defendant in her testimony, swears that she observed on one or more occasions what she regarded as evidence of love and affection between plaintiff and defendant. But when she heard, a few days after the wedding, of the fact that her daughter had been married to plaintiff, she was apparently as much grieved and surprised over it as the parents and friends of the plaintiff, and expressed herself disappointed that her daughter should have acted as she did and undertaken to get married before finishing her education. Moreover, the defendant, since this suit was instituted, admitted to plaintiff's father in the city of Charleston, and substantially to plaintiff's mother, when she and her mother made a rather mysterious call upon them, that plaintiff had never proposed to marry her. Plain-

tiff's father and mother have both so testified in the case; and the defendant has at no time undertaken to contradict their evidence.

Such are the facts disclosed by the record, as they existed prior to the day of the wedding. Now, let us look at what occurred on the day of the wedding. There is not the slightest evidence of any planning for a wedding, then or at any time. Plaintiff with a young fraternity brother was picked up by a Miss Harkness, a witness in the case, near their fraternity house, and invited to go on an automobile ride, which invitation was accepted. After driving about the streets of the city for a time, defendant was observed on the street, and after passing her once or twice, it was suggested, by Miss Harkness, perhaps, that they stop and invite her to join the party, and they did so and she accepted, plaintiff and defendant then occupying the rear seat. Thus was made up a summer afternoon automobile party, who set out for an afternoon of fun and pleasure, and with all that such a party could imply. The evidence is that they drove out what is called the North Front Street Road, and came to a place where there was a vacant house with a for rent sign on it, when plaintiff said to defendant: "let's go in town and get married and come out and live in that house." He says, and he is corroborated by the other members of the party: ."She laughed and said, 'I am game;' " and that Miss Harkness joining in the sentiment, took a hairpin from her hair and she or defendant twisted it into a ring as an engagement ring. After this pleasantry the party drove back to town, where they parked and left the car, the two girls going together to defendant's home, but were followed soon afterwards by the plaintiff and the young fraternity brother who had been with them on the automobile ride. When again together plaintiff played the piano, and the others danced; then the Victrola was played and defendant and plaintiff danced. Up to that moment the jocose proposal of plaintiff to get married was not mentioned, perhaps not thought of by any, member of the party; but while dancing it occurred to plaintiff to say to defendant: "By the way I forgot that we were going to get married;" and that she repeated: "That

is right, I forgot." At this suggestion the evidence shows
plaintiff and defendant started out, the other couple following
them. They proceeded to the county clerk's office, where
after a time, by misrepresenting their ages, they procured a
marriage license, one of plaintiff's fraternity brothers fur-
nishing the money to pay the clerk's fee. After getting the
license, they looked around the court house for a justice of
the peace to perform the ceremony, and finding none they
went on down to what is called Chancery Row, and there met
another young friend, Bob Monroe, and some one suggested
that he go along to see the fun. Then they met Miss Mildred
Hughes in a car; and she and Monroe met the plaintiff and
defendant and the other members of the party at the Metho-
dist Church, where the marriage took place. On the way
to the church a wedding ring was suggested, and the party
went into a jewelry store where some kind of a ring was pro-
cured to serve the purpose, the plaintiff arranging for it on
credit. At defendant's suggestion that she was acquainted
with one jeweler and did not want to go into his place, a
store across the street was selected to get the ring, and not
wishing to go to the minister of her church, because ac-
quainted with him, the student pastor of the Methodist
Church was selected; and he met them in his study at that
church, where the ceremony was performed, the Monroe
boy first going to his room to get ten dollars to pay the minis-
ter. There is some evidence of considerable frivolity at the
church before and while the ceremony was being performed.
In the ceremony the ring was forgotten, and some effort was
made by the minister to cover the omission after the cere-
mony by having plaintiff put it on defendant's finger, but
it was soon afterwards taken by plaintiff, and never returned
to defendant. After the ceremony and after paying the min-
ister, plaintiff requested him to keep the marriage a secret,
which the minister said was not an unusual request and he
agreed to do so. The marriage certificates filled out by the
minister and given plaintiff were given to the Monroe boy,
who took them to the fraternity house and hid them away
until they were later destroyed as hereinafter described.
After the marriage the party walked down High Street to

Pleasants where they left Miss Harkness, plaintiff and his friend Condry going on with the defendant to the apartment where she resided, where they left her and went back to their fraternity house, where they met young Monroe. Then it was that the three boys went to the New Dominion Building where a newspaper was published, and sought the editor and obtained his promise not to publish any account of the wedding.

The nature of the arrangements for the wedding, the rapidity with which they were made, show that these young people were desirous of getting out of it all the thrills which a real wedding would furnish, a license, a ring, a ceremony, then secrecy. When the minister was called by 'phone by one of the boys, he asked for a little time to make a change of clothing. When he arrived at the church he found a party of school boys and school girls fresh from an afternoon joy ride and lark, the boys bareheaded and clad in their sweaters, the girls dressed in sport clothes; only the minister had on the wedding garment. It is not for us to criticise, but we can not but express surprise that the spectacle thus presented did not suggest the propriety of caution, and of first conferring with those young people and learning from them the real purpose of the proposed marriage, and of advising them against hasty and inconsiderate action before proceeding to administer the solemn service prescribed by his particular Christian denomination. What mistakes might have thus been avoided and what trouble and heart aches of parents and friends might thereby have been averted!

Let us next consider what followed this unfortunate drama, bearing on the question of the validity of the marriage contract and the purposes and intentions of the parties thereto. Almost immediately they began to realize the seriousness of their act, and both engaged in plans to be relieved of their unfortunate situation. Plaintiff called his cousin Edward Alexander of Fairmont, to come to Morgantown. He responded at once, arriving soon afterwards in his automobile. On his arrival plaintiff and defendant with Mildred Hughes met him at a store, and all got in Alexander's car and drove across what is called Sunny Side Bridge up Stewart Street about half way, when the car was stopped, and at the request

of Alexander and prompted by defendant, and in whose statement defendant is said to have acquiesced, plaintiff repeated to him the facts pertaining to the marriage, substantially as we have recited them. Alexander made some suggestions, which do not seem to have been followed. They drove back into Morgantown and there separated, and Alexander went home. Nothing further was done until the next day, when plaintiff and his friend Condry met defendant and her friend Miss Hughes at a drug store, where they all waited for Bob Monroe and his uncle John Wyatt, an attorney of Shinnston whom Monroe had called to advise these parties how to get out of their trouble. On Monroe's arrival shortly afterwards, without Wyatt, and after discussing the subject for a while, and nothing then being agreed upon, the meeting adjourned, defendant agreeing to meet plaintiff and others the same afternoon, with Wyatt who was to come from Shinnston, to further consider the subject of getting the marriage annulled; and that afternoon plaintiff and defendant with Bob Monroe and Miss Hughes drove out the Fairmont road and met Wyatt coming from Shinnston. At the meeting place plaintiff and Monroe reported to Wyatt the facts and circumstances of the marriage already detailed, that it was done in jest and as a joke, and that they wanted to get the marriage annulled. After hearing them plaintiff reported to defendant that Wyatt had advised that they destroy the marriage certificate, each of the four, including defendant, taking a piece of it and tearing it into small bits and spreading them along the road on the way back. When they got back to town, the party separated, plaintiff and Monroe going to the fraternity house, and the girls going to their homes. Condry was at the Fraternity house, and Wyatt soon followed them there and reported that he had seen and conferred with Mr. Charles Baker, an attorney at Morgantown, and advised them to see Baker, which plaintiff, Monroe and Condry did that evening, going to Baker's residence. There they went over the facts and explained them to Baker substantially as already recited, Baker referred them to the Wartenburg case herein cited, and suggested how nearly it resembled in

facts the present case, and how it could be followed in obtaining the relief the parties desired.

Mr. Baker was examined as a witness on behalf of plaintiff, and referring to a written memorandum swears that plaintiff, Condry and Monroe had related to him the facts substantially as already detailed. This meeting with the boys was on Tuesday night. Mr. Baker further swears, again speaking from his written memorandum, that on Wednesday about three o'clock, defendant, Miss Hughes and the Monroe boy came to his office. He says he put Miss Hughes and Monroe out of the room and talked to defendant privately; that she told him exactly the same story that plaintiff and the other boys had told him the night before; and to use his own language: "She told me that the whole thing was a joke and jest, that they never had intended to get married, that they had not lived together an instant, that she did not love Jamison and did not want to live with him and never had, * * * * that the whole thing was a joke and was done in a spirit of dare, * * * * that they all had had a lot of fun out of it." The witness further testified: "I was groping partly blind in the dark myself about this, I didn't know what ought to be done, and when these people came to my office I talked with Ann myself, in order to satisfy my own mind how she felt about it, so that I might know what ought to be done." Defendant admits her visit to Mr. Baker's office and that she had a conference with him, but in her testimony she attempts to put a different coloring on it from that given by Mr. Baker. She says he did refer to the Wartenburg case, and imputes to him the suggestion that she should always remember that the marriage was a joke and a jest. And the witnesses Monroe and Miss Hughes undertake in some particulars to corroborate defendant as to the suggestion of Mr. Baker. Monroe, in his evidence, excuses his contradictory story told in a signed statement with the witness Condry, by saying that he was not under oath when he joined Condry in this statement, which was prepared by Mr. Baker as the substance of their first statement of the facts. This signed statement corresponds with the facts stated by plaintiff and his witnesses to the transactions.

But even more important and convincing is the evidence

of the meeting of the parents of plaintiff and defendant, at the home of plaintiff's uncle in Morgantown on Thursday evening, at which all were present. At this meeting these young people were requested by their parents to say what they desired to do about their situation. There can be no doubt that the defendant replied that she would prefer plaintiff to state their wishes. According to the evidence of all present his statement was that the marriage had been done purely as a joke; that defendant and he were not in love with each other; that he was not through school, and was not able to support a wife; and that he and she had talked the matter over the previous evening and had decided that they could not live together, and that if they were forced to do so it would simply mean the wrecking of two lives because of their thoughtless joking, and that the only thing to do was to get the marriage annulled; and that to this statement, defendant, when asked specifically if she felt the same way, answered, "Yes," that she would do whatever was decided upon. Defendant in her testimony undertakes to deny that she thus concurred. She says she said nothing. Certainly she did not protest, for everybody, including her father, so understood her, and that it was then and there agreed that suit should be at once instituted in defendant's name against plaintiff herein; and counsel were chosen or designated who would represent the respective parties. And the next day, Friday, suit was instituted by Miss Shakespeare against the plaintiff and process served on him as defendant. The praecipe for the suit was signed, not only by Posten & Baker, but also by Donley & Hatfield, that latter firm being the same counsel representing the defendant here and in the circuit court; and in her suit a bill was prepared in which substantially the same facts were alleged as are alleged in plaintiff's bill in the present case; but her bill was never in fact filed, because of the change of mind which seems to have overtaken her and her parents before it could be filed; and the suit was ordered dismissed by her father and mother, but they say because she demanded it. Her father in his testimony in this case admits that he understood the agreement at the conference on Thursday was exactly as plaintiff and the other witnesses

present understood it, and that the next day he acted accordingly. These facts being established by the evidence; what should a court of equity do? The suggestion is made in the record by counsel, and even in the written opinion of the circuit judge, that these proceedings were inspired by the parents of plaintiff. The evidence is clear and undisputed that neither of them knew of the marriage until Wednesday, two days after it had taken place, and after the parties themselves had done much towards securing an annulment. Of course they became interested as the defendant's parents did, which resulted in the conference of Thursday night. What parents would not have done so, especially when their only children were so involved, and in whom their hopes and ambitions had been centered and fixed? The wrecking of two lives near and dear to them was here involved. They met as parents naturally would to assist their children in doing the right and proper thing. They are shown to have consulted together with that end in view. Plaintiff's father distinctly stated at that meeting that if the children were in fact in love with each other and wanted to live together, that he would in no way interfere; that it was up to them to decide. The result was as already stated. There is not a thing in all this voluminous record to justify even the suggestion of bad faith or improper conduct on the part of plaintiff's parents or either of them. On the contrary, there is evidence of their most kindly consideration of both parties. Even after the present suit was brought, when defendant and her mother called upon plaintiff's father and mother in the city of Charleston, and she made the suggestion that she believed plaintiff would see her if they would not interfere, plaintiff's father replied, and she does not deny it, that he had not interfered and would not, and advised her to call upon plaintiff and try to make an appointment to see him, if he would see her. In the face of all this evidence, should relief be denied?

In reaching his conclusions the judge below seems to have regarded most of this evidence as immaterial and to have cast it aside as unworthy of consideration and avows his "belief strictly in the Biblical teaching that the party who interferes in any way or tries to separate husband and wife,

is committing a great sin." This is a suggestion that some one in the case has committed a great sin, which in other parts of the opinion is disavowed. And we do not quite see the force of this sentiment when applied to the case in hand. The question here is, whether in truth a marriage contract was ever made or consummated. The facts, we think, show that no such contract was made, except in jest. Certainly none was ever consummated. The status of the parties has remained the same as before the ceremony, and the contract has little to stand upon except the ceremony, and as was said in some of the cases cited and some to be cited, it takes more than a religious ceremony to consummate such a contract. Marriage may be likened to a beautiful plant, which when properly set in a fertile soil and cultivated and watered and warmed in the sunshine of love and affection, will bloom and become an object of perennial beauty and a joy forever. But marriage does not belong to the class; "Insectivorous," which by brilliancy of color or fragrance of flower, or both, first attracts, then allures, then entraps and destroys its victims.

The question recurs: Do the facts established by the evidence call for the application of the legal principles invoked by the pleadings? The principle of other cases cited, affirmed in the first of the Crouch v. Wartenburg cases and reaffirmed in the second, *supra*, is that: "A marriage ceremony, though actually and legally performed, when entered into in jest, with no intention of entering into the actual marriage status and all that it implies, and with the understanding that the parties are not to be bound thereby, or assume toward each other the relation ordinarily implied in its performance, including the duties, obligations, rights and privileges incident thereto, and followed by no subsequent acts or conduct indicative of a purpose to enter into such relation, does not constitute a legal basis for the marriage status, and the pretended marriage may be annulled in equity at the suit of either party." It is true that in those cases both parties persisted to the end of the litigation that the marriage was conceived in a joke and both concurred in the proposition to have it annulled. That both parties in this case were in accord in the beginning and until after de-

fendant instituted her suit there can be no doubt in the world. What effect then, can her change of purposes have on the rights of the parties? We think the facts present and attending the marriage must control unless the invalid marriage has been since ratified by the parties as by cohabitation and a change in their status. In 1 Bishop on Marriage, Divorce and Separation, sec 295, the author says: "Though marriage is a public interest of the highest order, and the status of marriage is cast upon the parties by the law, yet the course of the law is to impose it only on those who seek it, not upon the non-consenting. And as matrimony can exist only in pairs, both the man and the woman must consent mutually to the same thing at the same time—elements which in combination constitute a contract." In *Clark* v. *Field,* 13 Vt. 460, a leading case on this subject, it was held that where a marriage ceremony was had under a mistake of one of the parties as to its legal effect and it was not intended to be followed by cohabitation, without a future public marriage ceremony, and was not consummated, a court of chancery may decree it null and void at the election of one of the parties. The minds of the parties must meet in a marriage contract as in all other contracts, else it is not binding on either party. *Dorgeloh* v. *Murtha,* 156 N. Y. Sup. 181, 185. And in another leading case, *McClurg* v. *Terry,* 21 N. J. Eq. 225, cited with approval in the Crouch-Wartenburg case, the rule is stated to be that: "A marriage ceremony, though actually and legally performed, when it was in jest, and not intended to be a contract of marriage, and it was so understood *at the time* by both parties and so considered and treated by them, is not a contract of marriage. *Intention* is necessary, as in every other contract." So that it is of no importance that the defendant, since the marriage and since she withdrew her suit or allowed it to go by default, has for some reason not explained, changed her mind; if there was no valid contract between the parties at the time of the marriage, she can not at her election afterwards convert a falsehood into a verity.

Numerous other cases might be cited illustrating the principles controlling our decision and their application to cases based on fraud or mistake and other grounds of equity cog-

nizance, but we think, in view of our own cases cited, enough has been said to fully justify our conclusion to reverse the decree below, and to enter the decree already suggested, which we think should have been entered below, annulling the marriage between plaintiff and defendant of August 14, 1922, and the public record thereof expunged and adjudged to be of no binding force and effect for or against either of the parties thereto.

*Reversed, and decree entered.*