E. Ward Allen *v.* E. Belle Allen

(No. 9505)

Submitted January 18, 1944.  Decided February 1, 1944.

*Haymond Maxwell* and *John B. Wyatt,* for plaintiff in error.

*Powell, Clifford & Jones,* for defendant in error.

Fox, JUDGE:

This suit, instituted in the Circuit Court of Harrison County, seeks to annul a marriage on the grounds of alleged fraud in its procurement on the part of the defendant wife. In substance, the fraud alleged by the plaintiff, husband, in his bill, is that the defendant, at the time of the marriage ceremony, entered into the same with the intent and purpose not to fully consummate the marriage by engaging in normal sexual intercourse with the husband, and that she carried out such intent and purpose and refused to engage in or permit such intercourse over a period of six and a half years, during five years of which the parties occupied together an apartment in the City of Clarksburg, slept in the same bed, and but for the alleged absence of sexual intercourse lived together in a normal manner as husband and wife. The wife denies that she refused to engage in sexual intercourse with her husband, except on one particular occasion; but admits that there was no such intercourse during the first eighteen months of their marriage. The marriage occurred at Oakland, Maryland, on June 6, 1936, but was not announced until around Thanksgiving in 1937. During this period the parties did not live together, and at no time had sexual intercourse with each other. With the defendant's answer, and as a part of the same, she filed her cross-bill alleging desertion on the part of the plaintiff, without cause, and prayed for separate maintenance. The suit was referred to a commissioner under Code, 48-2-26, and evidence taken before him, after which he filed a report in which he says:

> "The undersigned is of the opinion that the relief sought by the complainant should be denied and that the relief sought by the respondent should be granted."

Exceptions to this report, filed by the plaintiff, were overruled, and on February 20, 1943, the circuit court entered a decree denying the relief sought by the plaintiff,

awarding the prayer of defendant's cross-bill, and requiring the plaintiff to support the defendant "for and during her natural life, or until she shall sooner marry or until there is a reconciliation between the plaintiff and defendant"; and the plaintiff was required to pay to the defendant, without any limitation as to time or otherwise, fifty dollars per month, payable in installments of twenty-five dollars on the first and fifteenth days of each month, beginning March 1, 1943. From this decree, on petition of the plaintiff, we granted this appeal.

The plaintiff seems to assume, and we think correctly, that Code, 48-2-2 and 3, afford statutory authority for his suit. Code, 48-2-2, provides:

"When a marriage is supposed to be void, or any doubt exists as to its validity, for any of the causes mentioned in section one of this article, or for any other cause recognized in law, either party may, except as provided in the next succeeding section, institute a suit for annulling or affirming the same, and, upon hearing the proofs and allegations of the parties, the court shall render a decree annulling or affirming the marriage, according to the right of the case. In every such case, and in every other case where the validity of a marriage is called in question, it shall be presumed that the marriage is valid, unless the contrary be clearly proven, and, if the marriage be decreed to be valid, it shall be conclusive upon all persons concerned."

Section 1 of Article 2, mentioned above, provides that certain marriages are void when so declared by decree of nullity; but marriages procured by fraud are not mentioned in said section. Code, 48-2-3, apparently recognizes that a marriage may be annulled for fraud in its procurement, because it provides that, "A suit for annulling a marriage may not be instituted: * * * (b) where the cause is fraud, force or coercion, by the party who was guilty of such fraud, force or coercion, nor by the injured party if, after knowledge of the facts, he or she

has by acts or conduct confirmed such marriage." Reading these sections together, the plain inference is that where there has been no confirmation of a marriage, procured by fraud, it may be annulled. However, we do not have to depend upon the statute, although we think it warrants annulment in a proper case. In *Crouch* v. *Wartenburg*, 86 W. Va. 664, 104 S. E. 117, this Court held, "A court of chancery, by virtue of its ordinary equity powers, possessed jurisdiction to entertain a suit for the purpose of annulling a marriage supposed to be void, or as to the validity of which some doubt may exist." See also *Meredith* v. *Shakespeare*, 96 W. Va. 229, 122 S. E. 520. Both of these cases grow out of marriages entered into in a spirit of jest or joke, and in which it was contended there was no real and serious intent to enter into a marriage contract. If courts are willing to annul a marriage on that ground, certainly they will not refuse to annul a marriage procured by fraud. Many other authorities sustain the theory that aside from statutory authority, and under the inherent jurisdiction of courts of equity to set aside transactions based on fraud, marriages procured by fraud may be annulled; but such a marriage is voidable only, and may only be declared void and annulled at the suit of the injured party, and then only where the fraud practiced goes "to the very fundamentals or essentials of the marriage relations." 38 C. J. 1300, 35 Am. Jur., 234-5; *Anders* v. *Anders*, 224 Mass. 438, 113 N. E. 203, *Moore* v. *Moore*, 94 Misc. 370, 157 N. Y. S. 819. Uncommunicated intention of one party to a marriage, not to engage in normal sexual intercourse with the other, following the marriage, existing at its date, and subsequently carried into effect, is such fraud as will entitle the innocent party to an annulment of the marriage. *Millar* v. *Millar*, 175 Cal. 797, 167 P. 394; *Miller* v. *Miller*, 132 Misc. 121, 228 N. Y. S. 657; *Bolmer* v. *Edsall*, 90 N. J. 299, 106 A. 646. In view of these authorities, we have no doubt that the allegations of the plaintiff's bill, if sustained by proof, would entitle him to the relief prayed for therein.

On the other hand, if the allegations of defendant's answer and cross-bill be sustained by proof, which would in itself amount to a complete refutation of the allegations of the bill, then the plaintiff is not entitled to relief, and the allegations contained in the cross-bill bearing upon her right to support, if sustained by proof, entitle her to the relief prayed for therein. If the charge that the defendant fraudulently induced the plaintiff to enter into the marriage falls to the ground, then there was a valid, legal and binding contract of marriage, which imposes upon the husband the obligation to support the wife. If he fails in that duty, Code, 48-2-29, provides the wife a remedy against the husband's default. She may proceed against him in an independent suit to secure her support. She need not seek a divorce, but she can secure such relief in a divorce suit instituted by her, or by cross-bill or answer, praying for affirmative relief, in a divorce suit in which she has been made defendant. *Huff* v. *Huff*, 73 W. Va. 330, 80 S. E. 846. If a wife may seek such relief on answer and cross-bill in a suit against her for divorce, we see no reason why she may not do so when the suit against her is one for annulment, and where she resists such annulment. We hold, therefore, that the pleadings of the parties are sufficient to justify the relief prayed for by each; but inasmuch as the establishment of the truth of the allegations of the pleading of one of the parties amounts to negation or failure to establish the pleadings and allegations of the other, the case must rest on a determination as to who prevails on the facts presented. The circuit court having acted on the facts, we have the benefit of its finding, and due weight must be given thereto.

To justify an annulment of a marriage, the grounds therefor must have existed at the time of the marriage. If the marriage is legal, then it cannot be annulled, and can only be ended by suit for divorce in which its bonds may be dissolved. Code, 48-2-1, illustrates this. Under that section every ground making a marriage void from

the date when so declared, must exist at the date of the marriage sought to be annulled. It follows, we think, that if fraud in the procurement be grounds for annulment, at the suit of the innocent party, whether under the statute or under general equity jurisdiction, such fraud must have existed at the time the contract was entered into. "No subsequently formed intent can be considered on the question of annulment." Then the fraud alleged must be clearly proved. Code, 48-2-2, expressly says so, and many other authorities so hold. Code, 48-2-3, provides that where by act or conduct the injured party, after knowledge of the fact, confirms a marriage induced by fraud, a suit to annul may not be instituted, and we think this rule would apply under equitable principles in the absence of a statute. And, finally, courts of equity will not lend aid where there has been unreasonable delay in the assertion of a right; or, to put the proposition in another form, doubt is cast on the existence of a right when for a long period of time no steps are taken to vindicate the same. Such delay may be explained, but where the explanation runs counter to human experience and involves abnormal and unnatural conduct on the part of all parties concerned, it should be subjected to the most rigid scrutiny.

We now come to a discussion of the facts upon which the circuit court based its decree. We have no disposition to deal with the facts beyond those necessary to explain our decision. While nothing in the record reflects on the character and standing of the litigants, and they are held up as people of good repute, their conduct in relation to their marital relations shows an abnormality which, in all probability, is the real explanation of their tragic experience. A resume of the facts will explain this statement. The wife, before her marriage and for some time after, taught in the public schools, and may be assumed to be a person of intelligence and character. At the date of her marriage, she was thirty years old, the senior of her husband by six years. The marriage was

entered into after due deliberation, and after a courtship of three or four years. Prior to the marriage, the parties agreed that the same would not be announced until some time thereafter, apparently because the wife might run the risk of losing her position as a teacher if it became known that she was married; and it seems clear that, prior to the marriage, they discussed the question of children, and were in agreement that for the then present children were not desired, and that they would endeavor to avoid having children at least until a later date. It is neither suggested nor proved that the question of sexual intercourse was discussed before the marriage, and quite clearly the husband was entitled to believe that no impediment to such normal relation would develop. At the time of the marriage the wife lived at Wallace, and the husband in Clarksburg, where he was employed by a large business concern, and by whom he continued to be employed during all the years covered by this controversy. They were married at Oakland, Maryland, and spent the night together at a roadside camp between Oakland and their homes. The husband sought to have sexual intercourse with his wife, and for reasons not necessary to detail, such intercourse was denied him. The next day they returned to their respective homes, he to Clarksburg and she to Wallace. The husband visited his wife frequently, probably once every two weeks, at her home in Wallace. He says he sought sexual intercourse with her on various occasions prior to the announcement of the marriage and was refused. She says he did not make such request, but admittedly there was no such intercourse between the date of the marriage on June 6, 1936, and its announcement around Thanksgiving in 1937. Immediately following the announcement of the marriage, the parties made a three-day honeymoon trip to Washington, D. C. The wife says she and her husband engaged in sexual intercourse on two separate occasions while on that trip; the husband says there was no such intercourse. On their return to Clarksburg, they, to-

gether, immediately consulted a physician, and sought his advice as to the best way to avoid having children. He gave them such advice and prescribed the use of a certain method involving the use of a tube and its contents. The husband says that the wife would not use the tube, complaining that it caused her pain, indicating that its use was attempted. Admittedly, at the suggestion of the wife, that they try some other means, the husband on several occasions purchased and gave to his wife contraceptive rubbers, which he says they endeavored to use without success. The wife testified that on one occasion the husband became concerned as to whether the wife had become pregnant and telephoned to inquire on this point. The wife testified that following the announcement of the marriage she and her husband regularly had normal sexual intercourse on the average of as much as three times a month. He denies this, and says that when they attempted to use the rubbers, "She maintained that they hurt her too much and flatly refused to engage in any actual process of sexual intercourse." On May 6, 1941, the wife on her own volition went to a Dr. Zinn, a reputable physician, and submitted to a vaginal examination, and later with the knowledge and probably at the solicitation of the husband, the wife, in the spring of 1942, again went to Dr. Zinn and submitted to another test, which included a vaginal examination. Dr. Zinn testifies that on the first examination she appeared to be a virgin, his record of that examination containing this statement: "Introitus appears to be virginal. Examination was otherwise unsatisfactory because of lack of cooperation." He then testifies that, "The presence of the virginal introitus indicates that she had never engaged in normal sexual intercourse." The last examination did not change his opinion. Dr. Zinn was of the opinion that there was no physical reason why she could not engage in normal sexual intercourse, if she so desired. He also says that she stated to him she did not want children, but that, aside from this, she did not desire sexual intercourse even if

she could be assured that she would not become a mother. This statement she denies. In January, 1943, some three or four months after the parties separated, and after the institution of this suit, the wife submitted to an examination by Dr. Slater, who testified that, at that time, she was not a virgin, basing his statement on a vaginal examination then made by him. Without intending to reflect on the sexual conduct of the wife, it is suggested by counsel for the plaintiff that the condition found by Dr. Slater could very well have been brought about subsequent to the date of examination by Dr. Zinn. Some short time before the separation, the husband made inquiry of the father of the wife as to whether an injury supposed to have been suffered by her prior to her marriage might furnish the explanation of her refusal or inability to engage in sexual intercourse, and it appears that the father knew of no such result.

On this background matters came to a head in October, 1942. The husband says, in substance, that he told his wife that unless, within a certain fixed period of time, she would engage in normal sexual intercourse with him that he would leave her. He says that there was no intercourse following this ultimatum. He admits that after the expiration of the period aforesaid, and two or three days before he left her, she indicated that she would comply with his wishes, but that he did not believe she meant to comply and told her it was too late. The separation followed, and shortly thereafter this suit was instituted.

On these facts the circuit court denied the plaintiff the relief he sought, and we see no reason why we should reverse its action. In the first place, the evidence on many material points is conflicting, and we cannot say that the trial court's finding thereon is plainly wrong. Aside from this, we think plaintiff has failed to establish the one fundamental requirement necessary to his case, namely, that at the date of the marriage the plaintiff had the intent never to engage with him in normal sexual intercourse. We cannot doubt that these people on many

occasions attempted such intercourse, and that the defendant, in some degree, participated in such attempts. Without having made such attempts, how could she complain that the contraceptive tube and attempted use of the rubbers caused her pain. The husband himself testified that when the wife complained as to the use of the tubes, she suggested that they try some other method, after which he procured the rubbers. He says she complained that they also caused her pain, and this could only have resulted from their attempted use. If the wife was willing to submit to these attempts, it is difficult for us to reach the conclusion that, at the time of the marriage, she could have had the purpose and intent charged in the bill. We think her repugnance to the sexual act, if it existed, arose from developments after the marriage, and might have been overcome had the husband asserted his marital rights in a more vigorous manner, instead of refraining from asserting such rights during the first eighteen months of the marriage, and in joining with his wife in the plan to avoid having children. The case of *Tompkins* v. *Tompkins*, 92 N. J. 113, 111 A. 599, to some extent, conforms to our view. If, in fact, there never was normal sexual intercourse between the parties, the husband is not entirely blameless. He cannot enter into an unnatural and unworthy understanding with his wife involving sexual relations, and then complain of the result which may follow therefrom, and when, as a natural result, the marriage breaks down say that it, in fact, never existed. Then, six and a half years, during five years of which time they have occupied the same apartment and bed, is too long a time for deliberation as to whether or not either party had been defrauded, and quite naturally raises a suspicion as to the good faith of any allegation of fraud. Men do not ordinarily submit to the indignities which the plaintiff claims he suffered during all of these years, without prompt and vigorous action to correct the situation. We think the plaintiff submitted to the situation, evidently unsatisfactory to himself and his wife, be-

cause it was, in part, of his own making, and we think he waited too long to be heard to complain that there never was a marriage. We do not say that the husband has received proper treatment at the hands of his wife. We think the contrary is true. But we do think that the conduct of these parties in their life together, particularly their efforts to have sexual intercourse in such a way as to avoid the natural consequences thereof, clearly shown by the evidence, completely dispels the idea that at the date of the marriage the wife entered into the same with any fraudulent intent and purpose not to comply with one of its most important obligations and duties. She may have intended to avoid having children, if possible, but if so, the husband cannot complain, for, clearly in the beginning, at least, he was of the same mind. The burden cast upon the plaintiff to clearly prove his case has not been met.

Little more need be said. The marriage stands, and the obligation of the husband to support his wife remains. Considering the earnings of the husband, and the wife's financial condition, the allowance made by the circuit court is not unreasonable as to amount, and, indeed, is not attacked on that ground.

The decree of the Circuit Court of Harrison County is affirmed.

*Affirmed.*

On Petition for Rehearing:

In the opinion originally filed, it is stated in the fourth paragraph thereof, in discussing the intent of the parties necessary in an annulment case, that "No subsequent intent or conduct can be considered on the question of annulment". We now consider this statement too broad. The opinion will be corrected to read: "No subsequently formed intent can be considered on the question of annulment". The incorrect statement was not the basis of our decision, and we do not consider a re-hearing necessary to make the correction.