Dorothy F. Jardine, Appellee, v. Charles A. Jardine, Appellant.

Gen. No. 39,041.

Heard in the second division of this court for the first district at the October term, 1936. Opinion filed June 29, 1937. Rehearing denied July 9, 1937.

MARLOW J. MADDEN, of Chicago, for appellant.

BENJAMIN H. EHRLICH, of Chicago, for appellee; AARON H. COHN, of Chicago, of counsel.

Mr. Justice John J. Sullivan delivered the opinion of the court.

This appeal seeks to reverse a decree granted to plaintiff, Dorothy F. Jardine, annulling her marriage to defendant, Charles A. Jardine.

Plaintiff's complaint filed May 17, 1935, alleged substantially that she married defendant August 7, 1931, in Evanston, Illinois, and that she lived with him as his wife until February 19, 1935, when she left him after being informed that their marriage was illegal and void because the decree of divorce which he secured in Reno, Nevada, on August 3, 1931, from his then wife was a nullity; that he left the State of New York, where he actually resided, and went to Reno, Nevada, where he established a residence for the statutory period of six weeks for the sole purpose of securing a divorce in the latter State, and that he immediately left the State of Nevada on August 3, 1931, after the entry of the aforesaid decree of divorce on that date, returning to Evanston, Illinois, for his marriage to plaintiff and within a few days thereafter to New York City; that when he went to Reno, and lived there for six weeks before filing his complaint for divorce, he did so without any intention of remaining or residing there permanently or for an indefinite period but solely for the purpose of procuring a divorce from his then wife and "for the purpose of fraudulently attempting to confer jurisdiction upon the Second Judicial District Court for the State of Nevada in and for the County of Washoe in the said divorce proceedings"; and that in said cause the defendant presented false testimony as to his residence and perpetrated a fraud upon the Nevada court, causing it to enter a decree August 3, 1931, granting him a divorce from Marie Josephine Jardine. The complaint herein prayed that plaintiff's "purported marriage of August 7, 1931," to the defendant

"be declared to be null and void and a decree of annulment be entered herein."

Defendant's answer denied any fraud in his procurement of the Nevada decree of divorce or as to the bona fides of his intention to maintain a residence, either permanently or indefinitely in that State, and set out in detail the circumstances under which plaintiff accompanied him to Nevada and paid his personal expenses as well as the costs and expenses of his divorce so that she could marry him. Defendant asked that plaintiff's complaint be dismissed for want of equity.

Defendant's contentions as stated in his brief are "that there was no fraud affecting jurisdiction perpetrated upon the Nevada court; that the record of the Nevada proceedings, being without error on its face, was entitled to full faith and credit and could not be attacked collaterally by a stranger to those proceedings, and further, that plaintiff, having shown or alleged no legal interest in the Nevada proceedings and because of her participation and unclean hands, was barred and estopped under any circumstances to attack that Nevada decree collaterally; that the Nevada record, being without error on its face, the decree was absolutely valid."

Plaintiff's theory as stated in her brief is "that she may properly bring this suit to annul the marriage between the parties hereto by showing that the defendant did not have the capacity to marry her. In this case plaintiff asserts that defendant was incapable of contracting a legal marriage with plaintiff because he had a wife then living, the Nevada decree of divorce being void because the court that entered it had acquired no jurisdiction over the parties and because such decree was obtained by the practice of fraud upon the Nevada court. It is plaintiff's theory that in this attack upon a void marriage she can show the invalid divorce; that under such circumstances she is no stranger to the pro-

ceeding and has a legal interest in the subject matter of the suit; that the doctrine of 'unclean hands' advanced by the defendant to bar plaintiff, in this action has no application to causes of this kind."

The first question presented is whether the defendant when he went to Reno, Nevada, and lived there for the statutory period of six weeks, did so solely for the purpose of obtaining a divorce or whether it was his intention as an actual, bona fide resident of the State of Nevada to remain there permanently, or, at least, for an indefinite period. His intention is to be gleaned not so much from what he now states such intention to have been, but from the facts and circumstances as they occurred. That his sole purpose in going to Nevada was to secure a divorce is clearly established, and the following pertinent findings of the decree in the instant case on this material question are abundantly supported by the evidence:

"The Court further finds that the defendant on July 11, 1931, and for many years prior thereto, was a resident of the State of New York; that he was then married to MARIE JOSEPHINE JARDINE and was the father of three (3) children born unto him by the said MARIE JOSEPHINE JARDINE; that for several years prior to July, 1931, the said defendant consorted with the plaintiff herein, then a divorcee, and concluded with her to travel together to Reno, Nevada, for the purpose of procuring a divorce from his said wife; that pursuant to said plan the plaintiff herein advanced unto the defendant sufficient funds for their transportation and expenses; that during the month of May, 1931, they both departed from New York and spent several days at Chicago with her relatives; that during such sojourn in Chicago the defendant discussed the matter of his plans for the future with the said relatives and told them that after securing his divorce he planned to return to New York to live and to go into business; that while in Chi-

cago he, with the funds advanced by the plaintiff, purchased two (2) round-trip tickets to San Francisco, California and back to Chicago, with stop-over privileges at Reno, Nevada.

"The Court further finds that accordingly they arrived at Reno, Nevada, on May 29, 1931, where the defendant registered at one of the hotels as a resident of Reno, Nevada, and the plaintiff registered at the same hotel as a resident of Chicago, Illinois.

"The Court further finds that they remained in Reno, Nevada, for the required six weeks residence period, at the expiration of which said period, he instituted divorce proceedings on the 11th day of July, 1931.

"The Court further finds that on the following day, they proceeded with their travels, visiting San Francisco, California, and Salt Lake City, Utah, wherefrom they flew to Reno, Nevada, arriving on August 3, 1931, on which date the trial was conducted and the divorce was granted from his said wife.

"The Court further finds that immediately after the said hearing, on the night of August 3, 1931, the said defendant and the plaintiff herein departed for Chicago, arriving on August 7, 1931.

"The Court further finds that upon their arrival, the defendant procured a marriage license at the Cook County Clerk's office, subscribing to an affidavit that he is a resident of the State of New York, and married the plaintiff on that date in the City of Evanston, Cook County, Illinois.

"The Court further finds that on August 9, 1931, they departed for New York, where they lived together as husband and wife for several years, during which time the defendant voted as a resident and citizen of the State of New York.

"The Court further finds from all the testimony that the defendant was not a bona fide resident of the State

of Nevada during his alleged six weeks' residence but was in fact and in law a citizen and resident of the State of New York and he traveled to Reno, Nevada, not for the purpose of becoming a bona fide resident there but only to obtain a divorce from his wife.''

It has been repeatedly held that no jurisdiction is conferred upon a court to enter a valid decree of divorce where the party procuring same perpetrates fraud or a deliberate imposition with respect to his or her residence in attempting to confer jurisdiction on such court. That Jardine's mere physical presence in Reno, Nevada, immediately prior to the filing of his complaint for divorce did not confer jurisdiction on the Nevada court to grant him a divorce is generally recognized as the law.

In passing upon this question in *Walker v. Walker,* 45 Nev. 105, when the statutory residential require- ment was six months rather than six weeks, the court said at p. 108:

''Residence in this state for the statutory period of six months solely for the purpose of obtaining a divorce is not sufficient to give jurisdiction, but a bona fide residence with the intention of remaining must appear. Where residence is made the basis of jurisdiction, parties who invoke the power of the court to relieve them from the marriage tie must bring themselves clearly and affirmatively within the jurisdiction of the court. *Fleming v. Fleming,* 36 Nev. 135, 134 Pac. 445; *Presson v. Presson,* 38 Nev. 203, 147 Pac. 1081. But the mere fact that the main purpose of one in going to another state is to obtain a divorce will not prevent a divorce there if it is his or her purpose to remain permanently.''

In *Latterner v. Latterner,* 61 Nev. 285, the court held at p. 290:

''Prior to the amendment the six months' residence clause had been definitely construed by this court. The

residence required was determined to be of a character denoting the present intention on the part of the one claiming it to make the county in which the suit was instituted the person's home, at least for an indefinite period."

In 9 R. C. L., it is said at pp. 403 and 404:

"So it is generally held that merely going to a state for the purpose of securing a divorce, and residing there the required length of time, but without any intention of remaining there permanently or indefinitely, is not sufficient to give jurisdiction in divorce proceedings."

In *Way v. Way,* 64 Ill. 406, the court held at p. 414:

"A wise policy requires us to hold that he came into this jurisdiction merely to procure a divorce, without any bona fide intention of residence or regular business here, and with the intention of immediate return to his domicile and business in another State, and that the court acquired no jurisdiction of the relation between the parties. Though a suit for divorce, upon its face, is a mere controversy between the parties to the record, yet the public occupies the position of a third party. Society has an interest in every marriage, and it is the duty of the State, in the conservation of the public morals, to guard the relation, and to see that the status of all applicants for its dissolution should be established."

To the same effect are *Hill v. Hill,* 166 Ill. 54, and *Janssen v. Janssen,* 269 Ill. App. 233.

It appearing conclusively that the Nevada court was without jurisdiction to enter the decree of divorce involved here, may the courts of this State inquire into the proceedings and decree of the court of the sister State to determine whether that court lacked jurisdiction of the parties and the subject matter?

In *Frey v. Frey,* 59 F. (2d) 1046, in passing upon the applicability of the full faith and credit provision of the constitution to a like situation, and upon the right

of the courts of one State to inquire into the question of the jurisdiction of the parties and the subject matter by the court of a sister State granting a divorce, the court said at p. 1047:

"Undoubtedly it is true that a divorce granted in any state according to its laws by a court having jurisdiction of the cause and of both the parties is valid and effectual everywhere, but a divorce obtained by a person legally domiciled in one state who leaves that state and goes into another solely for the purpose of obtaining a divorce and with no purpose of residing there permanently, is invalid and the state of bona fide residence may forbid the enforcement within its borders of a decree of divorce so procured. *Andrews v. Andrews*, 188 U. S. 14, 23 S. Ct. 237, 47 L. Ed. 366. And this is true even though the decree of divorce recites facts sufficient to give the court jurisdiction. *Sewall v. Sewall*, 122 Mass. 156, 23 Am. Rep. 299. The underlying reason for this is perhaps nowhere better expressed than by Mr. Justice Field in *Maynard v. Hill*, 125 U. S. 190, 211, 8 S. Ct. 723, 729, 31 L. Ed. 654, where he said: 'Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.' "

In *Chamblin v. Chamblin,* 362 Ill. 588, a similar doctrine was enunciated in the following language at pp. 590, 591:

"Appellant claims that the decree for divorce in Nevada was obtained through fraud and that the courts of Nevada had no jurisdiction because Chamblin was not a bona fide resident of that State when he brought

suit. She relies upon the decisions of the United States Supreme Court and of this court, which hold that the constitutional provision requiring full faith and credit to be given to the judicial proceedings of another State does not prevent an inquiry into the jurisdiction of the court which rendered the judgment or decree, either as to the person or the subject matter, notwithstanding a recital therein of the jurisdictional facts. (*Thompson v. Whitman,* 18 Wall. 457; *Simmons v. Saul,* 138 U. S. 439; *National Exchange Bank v. Wiley,* 195 id. 257.) In consonance with those holdings we have repeatedly announced the same doctrine. (*Dunham v. Dunham,* 162 Ill. 589; *Field v. Field,* 215 id. 496; *Forsyth v. Barnes,* 228 id. 326; *Pembleton v. Illinois Commercial Men's Ass'n,* 289 id. 99.)''

From the foregoing quoted decisions and the cases cited therein, it is clear that since the Nevada court did not have jurisdiction of the parties and the subject matter, the decree of divorce rendered in that State to Jardine is void, that the courts of this State may inquire into the proceedings, judgments and decrees of a court of another State to determine if that court had jurisdiction of the subject matter and the parties, and that there can be no question but that all judgments and decrees rendered by a court without jurisdiction are void. (*Field v. Field, supra.*)

It having been shown that defendant's Nevada divorce decree was void because the court there had no jurisdiction to enter same and that the courts of this State in a proper case may inquire into the question of the jurisdiction of the Nevada court, the next question is whether plaintiff, a stranger to the proceeding and decree of the sister State, has the right to attack same collaterally and show the invalidity of such decree. Since the Nevada court was without jurisdiction and therefore without power or authority to enter the divorce decree, such decree was not legally effective to

sever the marital relation existing between defendant and his then wife. That divorce being void, defendant was not free to remarry and his marriage afterward to plaintiff pursuant to it was also void. The invalidity of the marriage of the parties to this proceeding was an established fact since its very inception and all that is sought herein is a judicial pronouncement of its nullity. Such marriage "being a nullity, no decree is necessary to avoid the same. A void marriage is good for no legal purpose and its invalidity may be shown in any court, between the parties, either in the lifetime of the parties thereto or after their death." (*Cartwright v. McGown,* 121 Ill. 388.)

In *Simmons v. Simmons,* 19 F. (2d) 690, the plaintiff filed a bill for divorce against her husband, who, in turn, filed a cross-bill to annul on the ground that when their marriage took place plaintiff had a husband living from whom she had not been legally divorced. That decision is illuminating in that the facts therein are almost identical with the facts here and it determines the question as to the right of a stranger to a void decree of divorce entered in one jurisdiction to attack same collaterally in another jurisdiction, as well as the question as to whether the rule of *pari delicto* or the equitable principle of "clean hands" are applicable in a proceeding of this nature to bar the granting of the annulment of the void marriage. In that case the court said at pp. 690, 691:

"The court below found from the evidence that the plaintiff and defendant were living together in the District of Columbia as husband and wife under the name of Simmons, although at the time it was known to defendant that plaintiff was a married woman. It was while they were so living together that plaintiff filed her bill for divorce in the Virginia court, and procured the decree above mentioned. The court also found as a fact, and it is fully supported by the record, that the

Virginia decree was procured by fraud, 'both as to the required residence in Virginia of the plaintiff, and as to the alleged desertion of her husband.' Indeed, it strongly appears that defendant furnished plaintiff with the money to carry on her suit in Virginia.

"On this state of facts the learned trial justice below in his opinion concluded as follows: 'To allow him, under these circumstances, to take advantage of the void decree of divorce obtained by Irene Davis in order to avoid the consequences of his marriage to her, occurring about a month after the decree of divorce was entered, would be to lend the aid of the process and authority of this court to conduct that is violative of plain principles of equity and strike a blow at the integrity of the marriage relation.'

"In a case of this sort, neither the principles of equity nor the integrity of the marriage relation are controlling. We are here considering a case involving a marriage which is void *ab initio*.

". . .

"In proceedings to annul a void marriage, especially where it is so declared by statute, the rule of *pari delicto* and the equitable principle of 'clean hands' are inapplicable, since in such cases the state becomes a third party. While it is a settled principle of law that, where parties are in *pari delicto,* the court will refuse to extend them aid, and will leave them without remedy against each other, it is equally true that, where the state is an interested party, the contributing guilt of the parties to the suit will not operate as a bar to the granting of relief. 'The rule of *par delictum* will not be applied, however, to prevent relief in a suit to annul and set aside a void marriage. This is a matter in which the state is an interested party. Under the facts as found by the court, the marriage should be set aside as void, but the parties are entitled to no other or

further relief.' *Szlauzis v. Szlauzis,* 255 Ill. 314, 99 N. E. 640, L. R. A. 1916C, 741, Ann. Cas. 1913D, 454.

"...

"The interest of the state extends beyond the private grievance of the parties directly involved. It sponsors the welfare of society and the sanctity of the marriage relation. It refuses to countenance the continued perpetration of crime between such parties in violation of law and good morals. 'In this class of cases it is not the private grievance of the complainant alone which is considered, and which controls the nature and extent of the remedy, if any, which may be granted. The state is often called a "third party" to every suit for divorce or nullity of marriage. But not only the state is concerned, but the interests of innocent unborn children may be involved. If a decree of nullity is denied when nullity has been absolutely established by the proofs, the legality of the marriage is not established. . . . The fact that the marriage was null remains.' *Freda v. Bergman,* 77 N. J. Eq. 46, 76 A. 460.

"The equitable rule, that 'he who comes into equity must come with clean hands,' has no application where its enforcement would result in sustaining an act declared by statute to be void or against public policy. In such cases, the interest of society intervenes, and the state is regarded as a third party. In the case of *Martin v. Martin,* 54 W. Va. 301, 46 S. E. 120, 1 Ann. Cas. 612, the parties were prohibited from marrying in West Virginia because of relationship by blood. They went into Pennsylvania and were married. After they had lived together for 18 years, the husband brought a suit to annul the marriage, and the trial court dismissed his bill, on the ground 'that a court of equity ought not to entertain a litigant who vaunted his own iniquity, and made that his sole grounds for the decree asked from it.' The appellate court, reversing this de-

cree, said: 'If the parties could continue the marriage relationship without violating the criminal laws of the state, then the court might be justified in refusing to entertain the plaintiff's bill. But, when the law forbids the continuance of their marriage relation, notwithstanding its inception may have been a misdemeanor, it is the duty of both parties to make restitution by having the marriage annulled promptly. Their hands may be unclean, but it is the duty of a court of equity to permit them to clean them, when it can do so, and not permit such uncleanness to continue as a stench in the nostrils of the people. 19 Am. & En. Enc. Law (2d Ed.) 1212; *Com. v. Lane,* 113 Mass. 458, 18 Am. Rep. 509; *State v. Brown,* 47 Ohio St. 102, 23 N. E. 747, 21 Am. St. Rep. 790; 16 Am. & En. Enc. Law (2d Ed.) 134. While the rule is that equity will not entertain persons with unclean hands, yet there are just exceptions thereto, and the statutes of this state on marriage and divorce have mercifully provided that those who unwittingly enter into marriage that leads to the continual violation of law, notwithstanding their original sin, may have such relation annulled, so that they may go and sin no more. Such transgressors should get from before the public gaze as quickly as possible.'

"In *Heflinger v. Heflinger,* 136 Va. 289, 118 S. E. 316, 32 A. L. R. 1088, in a suit for annulment on the ground that the marriage was null and void, because it was contracted in violation of a statute of the state within six months from the date of the decree of divorce of the husband from a former wife, it was urged that plaintiff could not sustain his action under the equitable doctrine of 'unclean hands,' and on the further ground that the parties were in *pari delicto.* The case involved a marriage, valid in Maryland, where it was contracted, but void by statute in Virginia, where the parties were domiciled. The court was confronted by the difficult question of conflict of

laws, and the power of the Legislature of Virginia to give extraterritorial effect to a statute declaring such a marriage void.

"The court, in an exceedingly able and instructive opinion, said: 'The decree of annulment only ascertains that there has been no valid marriage between the parties, and obviates the necessity of ever thereafter being compelled to show its invalidity. If the complainant were acquiring any rights by virtue of his suit, other than the determination of his status in society, a different rule might apply, but he is acquiring none. *McMullen v. Hoffman*, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117. All he asks is to have judicially declared the fact that the marriage was a void marriage, and in this the public is interested. No property rights are affected, but the true status of the parties in society is ascertained and judicially declared. Under such circumstances, the doctrine of "clean hands" does not debar either party from bringing a suit to have the void marriage declared a nullity. It is not a suit for divorce. There was no valid bond of matrimony to be dissolved.'

"The decree below cannot be sustained upon the still broader ground of public policy. A void marriage will not be sustained on the theory of civil contract, since such a contract is void as against public policy. It will not be sustained in this instance on any principle of full faith and credit to be accorded the Virginia decree. If the action in Virginia was void and against the law and public policy of the District of Columbia, the full faith and credit clause of the Constitution (Const. U. S. art. 4, sec. 1) has no application to such a judgment. "...

"The parties could ignore this marriage without any liability whatever to either party. The statute creates an absolute defense in either a direct or collateral proceeding for either party to the transaction, in any pro-

ceeding wherein the alleged marriage becomes an issue. In the present case, the decree in favor of the husband would amount to nothing more than a general decree in equity in his favor. The law declares such a marriage void, and the court is without power to validate it, or to in any respect require the parties to live together, or in any manner recognize the validity of the marriage. It is void by law, and the courts have no alternative when the matter is presented, either directly or collaterally, in any matter in which it becomes an issue, but to declare it so.

"It follows, we think, that where it appears to the court that a marriage is an absolute nullity, the duty under the law of this District is to decree such a marriage void. . . ."

The purported marriage involved here being void *ab initio* "the decree of nullity adds nothing but simply operates as an estoppel against setting up the validity of the marriage in any future controversy." *Heflinger v. Heflinger, supra.* By the decree of annulment in this cause it is merely ascertained and declared that there was no valid marriage between the parties, and, in our opinion, the best interests of society are served and promoted by a legal determination of their status.

For the reasons stated herein the decree of the superior court is affirmed.

*Affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.