JOAN MARTHA TEICH, Plaintiff, Cross-Defendant, Appellant, *v.* RALPH D. TEICH, Defendant, Cross-Plaintiff, Appellee.

(No. 53091;

First District—April 8, 1971.

CRAVEN, J., concurring in part and dissenting in part.

Jerome Berkson, of Chicago, (Jerome Pinderski, of counsel,) for appellant.

Ira D. Schultz and Errett O. Graham, both of Chicago. (Sidney Z. Karasik, of counsel,) for appellee.

Mr. JUSTICE TRAPP delivered the opinion of the court:

Plaintiff, Joan Teich, appeals from the order of the Circuit Court dismissing her complaint in counts (1) for declaratory judgment that a certain Nevada divorce decree was void, and (2) for separate main-

tenance, or in the alternative, for divorce. She also appeals from a judgment granting the application of the defendant, Ralph Teich, to register the Nevada divorce decree. The defendant cross-appeals from an order awarding temporary attorney's fees to plaintiff in the sum of $5000.00. ■■ The order of the court dismissing plaintiff's complaint and each count thereof, is not in a form which is final and appealable. It appearing from the record, however, that the court had determined that the Nevada decree barred plaintiff's actions for separate maintenance or divorce, as well as the action for declaratory judgment, the order is treated as final upon the reasoning of *Lakatos v. Prudence Mut. Cas. Co.*, 113 Ill. App.2d 310; 252 N.E.2d 123 and *Peach v. Peach*, 73 Ill.App.2d 72; 218 N.E.2d 504. The effect of the order was to terminate these portions of the proceedings upon the merits and no amendment made would cure the complaint.

Plaintiff first contends that in view of the charge of fraud and collusion, it was error to dismiss plaintiff's complaint without taking evidence. Since evidence was taken upon the counter-complaint to register the Nevada decree, we need not concern ourselves with such issue if the decree was, in fact, entitled to registration. The same evidence and the same legal principles would apply to the determination of the validity or the assailability of the Nevada decree on the application to register the decree as would apply on the complaint to declare the decree void.

We proceed upon the issues of the judgments concerning the Nevada divorce decree and the award of attorney's fees. Plaintiff obtained a decree of absolute divorce from the defendant in the State of Nevada, on September 29, 1965, on grounds of mental cruelty. The divorce decree incorporated a property settlement and child custody agreement dated September 28, 1965. Defendant did not appear but was represented by counsel to whom he had given a power of attorney.

Plaintiff went to Nevada, taking four children with her, rented an apartment, lived six weeks in Nevada and left immediately after the entry of the decree. She has never returned to Nevada, and apparently went there for the sole purpose of obtaining a divorce upon grounds which would not then have been recognized in Illinois, the state of the marriage domicile. She was represented by counsel in Chicago, Illinois, and Reno, Nevada. Defendant paid all of her legal fees and her expenses of living in Reno, Nevada. The Nevada decree mentioned three children adopted by the parties during their marriage, but did not mention one child born to the plaintiff during the marriage.

Plaintiff alleges that the Nevada decree was based upon her fraudulent residence and a collusive agreement to the grounds of mental cruelty which she says were false. Plaintiff's testimony as to the reason for her

conduct is that defendant trumped up a false charge of adultery and thereafter coerced her to employ his attorney who arranged the trip to Nevada and the fraudulent divorce. She asserts an inadequate property settlement, an unsatisfactory child custody agreement, and in effect, a false denial of legitimacy of a child born of the marriage with consequent denial of child support for the said child.

Plaintiff testified that she and defendant were married November 3, 1951, and lived together as husband and wife until August of 1965. Three children were adopted, whose ages at the time of the hearing were ten and one-half, eight and one-half and five and one-half. A girl was born to plaintiff May 18, 1965, in Evanston, Illinois. This last child, who was four months old at the time of the Nevada decree, is the one whose name was omitted from the custody agreement and the decree.

All parties agree that defendant recognized the child publicly as his until June, 1965. Plaintiff testified that on June 19, 1965, while she and defendant were at a neighbor's party, an incident occurred which involves much of the testimony in the case. Plaintiff's version is that she had been talking to Robert Wescott, who was a social friend and had been at their home. Plaintiff was having difficulty with an earring, which kept falling off, and she stepped into a guest bathroom which adjoined a bedroom to look into a mirror to adjust the earring. Mr. Westcott followed her but remained in the bedroom, and they continued their conversation at which time both the bedroom door and bathroom door were open. She said her husband came in, hit Mr. Wescott, knocking him to the floor, kicked him in the face and then took her by the arm and dragged her home. After arriving home, defendant called the police, who came in response to the call, and advised defendant to calm down and think about it. Defendant suggested plaintiff file a complaint against Wescott for molesting her but she refused. The next day defendant accused her of having an affair with Wescott and struck her. The following day defendant told plaintiff he was sterile, accused her of an affair with Wescott and asked her to confess. She said she denied the affair, and told him the baby was his.

Defendant called Roger Eklund, an attorney, and Charles Horne, who has some association with defendant's business affairs, to come to his home about 5:30 in the evening on June 21, 1965. They did come and all met plaintiff in the family room at this time. The stories vary as to the conversation. Defendant testified that plaintiff told Horne and Eklund, in his presence in their home, that defendant was not the father of the child and that the father was Bob Wescott. Horne testified that plaintiff came into the room with the three men and sat down. She then said she had something on her mind she wanted to get off. He stated

that defendant said nothing. Plaintiff said: "I have something I want to get off my mind. Andrea is not Ralph's child. She is the child of Bob Wescott." Horne said that Mrs. Teich said she had relations with Wescott a number of times. Eklund testified that when plaintiff came downstairs and to the family room, defendant confronted her and asked her to admit to them that she had intercourse. He said: "Mr. Teich said to Mrs. Teich, 'Joan I want you to tell these men here that you have had intercourse with Bob Wescott and that the baby, Andrea, is Bob Wescott's baby'. I would say that perhaps Ralph had repeated the statement once again, and then Mrs. Teich said, 'All right, Ralph, that is true that I did have intercourse with Bob Wescott and Andrea is his baby.'" Plaintiff testified: "Mr. Horne learned of these accusations when Mr. Teich accused me in front of these two men. I told Mr. Horne that the accusations were false and denied them absolutely. If Mr. Horne testified otherwise he would be lying. I don't know if Mr. Horne is a liar. I don't know Mr. Horne very well. I told Roger Eklund that Ralph's accusations were false."

Eklund testified that he had done some work for Kurt Teich Company from time to time. He had drawn one or two wills for Ralph Teich and had handled two real estate deals for Ralph Teich. Plaintiff's testimony is that Eklund had also prepared a will for her. Roger Eklund had been associated with his father in the practice of law. From 1961 to 1964 Roger Eklund's father had performed legal services for Ralph Teich. Together they drew a will for Ralph Teich. The father drew a trust instrument for Ralph Teich. Roger Eklund drew trust instruments for the children. Roger Eklund is a co-trustee with Ralph Teich on Ralph's living trust and two other trusts. The Eklund office probated the will of Ralph Teich's mother. At the time of the divorce proceedings, there were two real estate transactions in which plaintiff released her dower interest and Eklund billed defendant for the services.

On the evening of June 21, 1965, while Eklund and Horne were at the Teich home, plaintiff and Mr. Eklund had a private conversation after the confrontation previously noted. She stated that Eklund told her he was representing Mr. Teich. She said the next day defendant said Eklund wanted to see her in his office. She made an appointment and went to Eklund's office. She told Eklund she did not want a divorce. Eklund said that as a favor he could represent both Mr. Teich and Mrs. Teich. She said she had several meetings with Eklund, and in each case defendant made the appointments. On her second visit, Eklund told her defendant was determined to have a divorce and determined to have the children. Plaintiff said that Eklund told her he spent a great

deal of time attempting to persuade Mr. Teich to a reconciliation. She stated she was always willing to reconcile. She had three meetings with Roger Eklund in July of 1965. The first meeting with defendant present was early in August. That was a signing meeting for signing the settlement and custody. As abstracted, she testified:

"I submitted a figure of $600.00 a month as necessary or appropriate support of myself and Andrea. I believe I said that I wouldn't leave Andrea while she was small and go off to work. I believe I said this in one of the later July meetings between Roger Eklund and myself alone * * *. I didn't want to leave Andrea alone at pre-school age. School age is pretty predictable about six. I never said that if I received this $600 a month until Andrea was in school, that is all I wanted. I never said I wanted anything. Mr. Eklund said he'd try to get this amount for me. I said the $600 that I wanted to have that support so I wouldn't have to leave Andrea before she was school age. Roger Eklund did not suggest that I reconsider and request more than $35,000. It was put to me that I was lucky to get this amount and that Mr. Teich would put me out with nothing * * *."

Plaintiff testified that Eklund told her that defendant would like to charge her with adultery in Illinois, that he was a man of means and could prove whatever he wanted to prove; that she would be left without money and without children. She said Eklund told her he persuaded Mr. Teich not to bring suit in Illinois for her sake. Eklund denied the foregoing conversation, and said he told her that if defendant could prove a flagrant case of adultery, she might not receive any alimony or custody of the children.

The custody and settlement agreement which was first signed in Chicago, Illinois, in August, and later by Mrs. Teich in Reno, Nevada, on September 28, 1965, with minor modification of the original agreement, recited the three legally adopted children by name and omitted any reference to the child born to Mrs. Teich. It included details as to custody: (a) the children should reside with the husband during the school year, but should be with the wife on weekends, while (b) the children should reside with the wife during summer vacation, but be with the husband on weekends; (c) that the children should have the Christmas vacation with the wife and the spring vacation with the husband; (d) provided for certain special weekends when the respective parties should have custody; (f) provided for custody on Christmas and (g) provided the sum of $5.00 per day for the children's food while in the custody of the wife, medical expenses and clothing for the children.

Eklund made arrangements with Attorney Richard W. Blakely, an

attorney in Reno, to locate quarters for Mrs. Teich and the children while in Reno, and to conduct the divorce proceedings for her. In corresponding with Mr. Blakely, Eklund said, *inter alia*:

"I am enclosing herewith a copy of the settlement which has been executed by the Teichs today. Please review the agreement to ascertain that it is suitable for your purpose. I would, of course, appreciate any comments you might have of any nature about the agreement. The Teichs understand that the agreement may have to be altered, if you have any suggestions or changes which you believe should be made. In reviewing the agreement, you will, if you recall our telephone conversation, understand why one of the children has been omitted."

At the time plaintiff was in Reno, Eklund wrote her a letter which was in part, as follows:

"Enclosed herewith in a sealed envelope you will find a draft of a letter which I have personally prepared for you. This should be handwritten on your stationery, inserting the date and the omitted name, and signed using your full name, Joan L. Teich, and mailed to me in an envelope marked as I have marked the envelope sent to you. As I have agreed, I will keep the signed letter in my file under lock and key. It will not be given to anyone unless some legal action is started by you or by Andrea at some later date in which the letter would be pertinent."

■■ Plaintiff did copy the letter and sent it to Mr. Eklund with a note in her own handwriting which included an expression of appreciation for his services. The copied letter states that Andrea Teich is not the daughter of Ralph Teich, and states that plaintiff had sexual relations with Robert Wescott during the period when Andrea was conceived. Eklund states that during the period prior to the divorce, defendant demanded that he obtain and put in the possession of Ralph Teich a letter of confession from Mrs. Teich to the adultery, and that he told Mr. Teich he would not give him one. He testified that he asked Mrs. Teich for the letter, and stated that it was for his (Eklund's) protection. He said that before she went away he told her he would expect the letter, and she agreed to it. Eklund also testified:

"When I got back from Mrs. Teich's her sealed letter that she sent back to me I sealed this in a new envelope and locked it in my vault. I kept it there until this action was instituted. Then I photostated it and gave a photostatic copy to Mr. Teich's attorney. I was Mrs. Teich's attorney. I told Mrs. Teich that it would never leave my hands unless she instituted some action such as what she did. Then I gave it to Mr. Teich's attorney. I didn't give the letter, I gave a photo copy."

Plaintiff states that after she returned from Nevada certain oral modifications of the custody agreement were made, and that defendant was not living up to these. Eklund told her there was nothing he could do. This went on until the middle of January, 1966. She went to Europe in March, 1966. She finally suggested that she get another attorney. Eklund agreed and also stated she would have to employ her own, as he would not want to be involved in a recommendation. She states that after she employed new counsel, she was advised she had been cheated.

Defendant was a man of means, possibly worth $1,000,000. The marital residence was sold for $52,000 and a new home had been purchased at that time for $90,000. Defendant, during the course of the marriage, had given Mrs. Teich securities worth $12,000, which she kept. She stated that she never knew his worth in detail, although he said he was a wealthy man. Defendant testified that plaintiff told him she was not after his money, and that she wanted $35,000 to give her $600 per month until Andrea was ready for school.

We note what relief is sought. Plaintiff seeks a divorce status, and she has that status. Defendant wants a divorce status and he has that status. Plaintiff desires custody of the children and defendant desires custody of the children. The question of the best interest of the children is paramount insofar as the law is concerned, and that question based upon current circumstances is always open irrespective of which party obtained the decree or which party was at fault. Plaintiff contends that the Nevada decree, in effect, declares the child born to her to be illegitimate and therefore deprived of support. The decree does not purport to make the child illegitimate but does, by omitting mention of the child, deprive plaintiff of support for the child. From the evidence, including plaintiff's testimony, computation of support for such child was included in the settlement received. The child's status as a lawful child of the marriage was not determined by the Nevada decree and the child is not bound thereby. The plaintiff's complaint does not directly pray for such determination, but rather seeks to reinstate the status by voiding the Nevada decree. The final relief sought is to avoid the effect of the property settlement and to claim alimony. This last item is the only item that requires the avoidance of the Nevada decree to accomplish ends sought by plaintiff, if they be justified.

■■ Under the authorities, the Nevada decree is not subject to collateral attack. In the case of *In re Estate of Day,* 7 Ill.2d 348, on 351; 131 N.E.2d 50, the Illinois Supreme Court, after finding that in fact the wife, an Illinois resident, went to Reno, Nevada, for the sole purpose of obtaining a divorce and not to establish a *bona fide* residence, also found that her husband had appeared in the Nevada proceeding by authorized counsel

but was not personally present, and found that his attorney neither introduced evidence nor questioned the witnesses. The court said, p. 351:

"If the circuit court was free to re-examine the matter of domicile we would sustain, as being amply supported by the evidence, its finding that Mrs. Allison failed to establish a domicile in Nevada. But the court was not free to retry that question. The Nevada decree recites that she was and had been a *bona fide* resident and a domicilary of Nevada for the prescribed period of time; and it is undisputed that the defendant husband appeared in the suit through authorized counsel and had full opportunity to contest the jurisdictional issue. The rule may now be taken as established that the constitutional requirement of full faith and credit bars either party to a divorce from collaterally attacking the decree on jurisdictional grounds in the courts of a sister State, where the defendant participated in the divorce proceedings and was accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered it. (*Sherrer v. Sherrer,* 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429; *Coe v. Coe,* 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451) * * *. The full faith and credit to which the Nevada decree is entitled forbids the courts of this State to find, on new evidence taken here, that the Nevada court made an erroneous decision as to its jurisdiction."

The court further held that once the appearance by counsel was established, the extent of activity in contesting the jurisdiction was immaterial and that complaints of fraud and collusion were foreclosed. While the court also noted that the attack in the *Day* case was by a stranger to the marriage, that is, his son, who was contesting Mr. Allison's second wife's right to take under his will, we do not think the decision was in any manner confined to the case of attack by a stranger. The court clearly stated the rule that neither party could attack the decree. (See also *Jamieson v. Jamieson,* 14 Ill. App.2d 233; 144 N.E.2d 540.) The case of *Atkins v. Atkins,* 393 Ill. 202, 208, cited by plaintiff, differs from *In re Estate of Day,* and from the present case in that the wife who attacked the Nevada decree was not personally served in Nevada, and did not appear in that suit, either in person or by attorney. The present case also differs from *James v. James,* 14 Ill.2d 295; 152 N.E.2d 582, in that a motion to vacate the property settlement was filed in the cause within thirty days after entry of the decree, and it appeared that the trial court had improperly advised the wife as to her property rights. In *Stilwell v. Continental Ill. Nat. Bank & Trust Co. of Chicago,* 31 Ill.2d 546; 202 N.E.2d 477, the wife did not enter her appearance in the *ex parte*

Arkansas proceeding. The case of *Jardine v. Jardine,* 291 Ill.App. 152; 9 N.E.2d 645, does not discuss the rule announced in *In re Estate of Day,* that appearance by attorney with opportunity to attack jurisdiction precludes both parties from collateral attack upon the decree. The case of *Grein v. Grein,* 303 Ill.App. 398; 25 N.E.2d 409, was one of constructive service with no appearance or defense by the wife.

■■ Plaintiff claims that the Nevada decree was obtained by fraud and duress practiced upon her. Insofar as the charge of duress is concerned, we think the evidence fails to show that plaintiff's will was dominated by defendant or his agents. In *Kaplan v. Kaplan,* 25 Ill.2d 181; 182 N.E.2d 706, where it was alleged that the threat of a wife to embarrass her husband by publication of compromising photographs taken by detectives caused plaintiff to enter certain property settlement agreements, it was held that the alleged conduct did not constitute duress. The court said (p. 187):

> "This allegation clearly presents no basis for a claim of duress inasmuch as it is well established that it is not duress to institute or threaten to institute civil suits, or for a person to declare that he intends to use the courts to insist upon what he believes to be his legal rights, at least where the threatened action is made in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process."

William M. McMillian, a surgeon, whose qualifications are not questioned, testified that he made examinations and tests upon Ralph D. Teich for sterility in 1955, 1958, 1964 and 1965, and that, in his opinion, defendant was sterile at the time of all examinations. While his testimoney might or might not be conclusive on the question of paternity, it was certainly a sufficient basis to give defendant an honest belief that the child born to his wife was not his, and that the child was the result of adulterous intercourse by his wife.

Plaintiff's conduct in going voluntarily to Nevada, in completing the necessary period of residence and in pursuing her complaint for divorce in Nevada, in writing an appreciative letter to her counsel, in obtaining a meticulously worded custody agreement, in obtaining an oral modification of the custody agreement in her favor, and in frequently demanding changes in the custody agreement do not support the charge of duress.

■■ Neither do we find that the charge of fraud is sustained by the evidence. As to the paternity of the child, plaintiff knew the facts and no misrepresentation could have been made to her except the strength of the case which her husband might be able to make regarding adultery.

Plaintiff is a college graduate who earned admission to Phi Beta Kappa, an honorary scholastic society, while in college. She certainly knew the effect of failing to mention the child in the custody agreement. Plaintiff may not have known the detail of her husband's wealth, but she was well aware that he was a man of considerable wealth. Plaintiff testified that she actually stated the sum which was provided in the settlement. No misrepresentation was made to her concerning her husband's wealth.

■■ It is next asserted that the omission of the mention of the child, Andrea, in the custody agreement has the effect of making the child illegitimate and deprives the child of support, all of which is against public policy. Plaintiff cites Ill. Rev. Stat., ch. 40, par. 4. It is:

"No divorce shall, in anywise, affect the legitimacy of the children of such marriage, except in cases where the marriage shall be declared void on the grounds of a prior marriage."

We do not think that the statute does anything more than it says, *i.e.*, that no divorce shall affect the legitimacy of a child born of the marriage unless the divorce is obtained upon the ground of prior marriage. We have held that the omission of the mention of a child in a divorce decree does not bar an action for support of a child. *Sturdy v. Sturdy*, 67 Ill.App.2d 469; 214 N.E.2d 607, and cases cited therein.

In analyzing the issues of fraud and duress, we have not considered it necessary to use the testimony of Eklund, nor the letter of confession which he obtained from her. There is nothing in the record to suggest that plaintiff's conduct would not have been the same without the letter. It appears to us that Roger Eklund was attempting to act as attorney for both parties, and that the ultimate result was a serious compromise of his position as plaintiff's former attorney. It would appear that defendant relented from his determination to seek a divorce in Illinois charging plaintiff with adultery in return for some assurance that if he consented to suppressing the scandal the terms of the settlement would be final, and that he sought to secure its finality by demanding a written confession. It further appears as the most obvious explanation of Eklund's conduct, that he advised her that the letter was a form of insurance that she would not change her mind. We can read no other purpose in the written statement that the letter would not be used unless plaintiff, or her daughter, started legal action at a later date in which the letter would be pertinent.

Counsel's voluntary disclosure of plaintiff's letter to defendant's attorney was certainly inappropriate conduct, and gives some color to a charge of inadequate representation of plaintiff's interest. It would be difficult to find a better example of the dangers involved in an attorney

attempting to handle adverse interests. Nevertheless, we do not find in this record, evidence that fraud or duress was practiced upon plaintiff in obtaining the Nevada decree.

We conclude that the matter of the paternity of the child has not been determined by the decree of the trial court registering the Nevada decree. No issue has been determined other than that the Nevada decree is entitled to full faith and credit.

■■ Defendant cross-appeals from an order allowing plaintiff $5,000.00 for attorneys' fees in connection with these proceedings. It is within the sound discretion of the court to allow attorneys' fees in a proceeding between the parties subsequent to the divorce decree. (*Mabbatt v. Mabbatt*, 78 Ill.2d 455; 223 N.E.2d 191.) It should be noted that in defendant's petition for registration of the Nevada decree, he also asks for limitation of the custody rights of the plaintiff. The petition purports to show expenses of $1899.22 and time expended by attorneys of 319¾ hours. Defendant opposed the allowance of attorneys' fees, by motion to strike. It does not appear that defendant specifically requested that evidence be heard. The court had conducted an extensive hearing at the time of the allowance and was familiar with the work involved, and the financial circumstances of the parties. Under such circumstances, it was not necessary that evidence be heard. There is no clear indication of an abuse of discretion. See *Canady v. Canady*, 30 Ill.2d 440; 197 N.E.2d 42, 45.

The judgments of the trial court are affirmed.

Judgments affirmed.

SMITH, P. J., concurs.

Mr. JUSTICE CRAVEN concurring in part and dissenting in part:

Upon the authority of *In re Estate of Day* (1956), 7 Ill.2d 348, 131 N.E.2d 50, the Nevada decree is immune from collateral attack by either party on jurisdictional grounds. Thus, I agree with the majority that the decree is subject to registration in Illinois and is determinative of the marital status.

It does not follow, however, that the property-settlement agreement is likewise immune from further judicial inquiry. An Illinois decree incorporating a property-settlement agreement alleged to be fraudulent, collusive and inequitable would be subject to a section 72 proceeding. See: *Roth v. Roth* (1970), 45 Ill.2d 19, 256 N.E.2d 838; *Van Dam v. Van Dam* (1961), 21 Ill.2d 212, 171 N.E.2d 594; *Wilson v. Wilson* (2nd Dist.

1965), 56 Ill.App.2d 187, 205 N.E.2d 636. See also *Schwarz v. Schwarz* (1963), 27 Ill.2d 140, 188 N.E.2d 673.

Thus, I dissent from that portion of the opinion that affirms the dismissal of the complaint in so far as it concerns the property-settlement agreement.