JOSSLINE FAUSTIN, A/K/A JOSSELINE LEWIS, PLAINTIFF-
APPELLANT, v. MAURICE LEWIS, A/K/A MAURICE RILEY
AND JAMES OSCAR LEWIS, DEFENDANT-RESPONDENT.

Argued November 17, 1980—Decided March 31, 1981.

*W. Marshall Prettyman,* Senior Attorney, argued the cause for appellant (Timothy Weeks, Executive Director, Essex-Newark Legal Services, attorney; Gerald Brennan and Doreen Gold-bronn, on the brief).

No appearance was made on behalf of respondent.

The opinion of the Court was delivered by

SULLIVAN, J.

Plaintiff Jossline Faustin was denied an annulment of her marriage to Maurice Lewis based upon a trial court ruling that she was guilty of "unclean hands" and thus not entitled to judicial relief. The Appellate Division affirmed. 172 *N.J.Super.* 399 (1980). This Court granted certification to consider the extent to which the equitable doctrine of unclean hands should have continued application to annulment proceedings.

The facts appear undisputed, although the case was never fully litigated, the ruling being made solely upon plaintiff's offer of proof. Plaintiff is a native Haitian who came to this country in 1974 on a temporary visitor's visa. At that time,

defendant was in the employ of persons engaged in the unlawful
business of arranging sham marriages between United States
citizens and Haitians for a fee of between $500 and $1200 so
that the latter could obtain permanent residence in this country.
Defendant, using various names, had married a number of
Haitians for this purpose. On November 4, 1974, he participated
in a marriage ceremony with plaintiff in Newark, New Jersey,
which was performed by Reverend Heber Brown. It is undis-
puted that plaintiff and defendant participated in the ceremony
solely for the purpose of making plaintiff eligible for lawful
permanent residence in the United States. Plaintiff had no
marital relationship with defendant either before or after the
ceremony.

In June 1977, a federal grand jury indicted defendant and
several other persons for unlawfully assisting Haitian aliens to
fraudulently obtain permanent residence in the United States in
violation of the immigration and naturalization laws. One of
the counts specifically referred to defendant's marriage to plain-
tiff. Reverend Brown was named in the indictment as an
unindicted co-conspirator.

In February 1978, plaintiff filed the present action in the
Chancery Division seeking an annulment of her marriage to
defendant. The complaint, after reciting the foregoing facts,
does not specify the grounds for annulment except to allege that
the marriage was fraudulent. Defendant did not answer the
complaint and a default was entered against him. At the final
hearing, plaintiff sought to amend the complaint to include an
additional count alleging a bigamous marriage. The court,
however, denied the application because notice thereof had not
been given to the defendant.

On December 20, 1978, the trial court dismissed plaintiff's
complaint, ruling that, even if plaintiff proved the allegations in
the complaint, she would not be entitled to relief because she
had knowingly participated in the fraudulent marriage and had
entered into it solely to obtain permanent residence in the

United States. The court held that plaintiff came into court with unclean hands and thus was not entitled to the relief sought. The Appellate Division affirmed for essentially the same reasons. 172 *N.J.Super.* 399 (1980).

The divorce and nullity statute, *N.J.S.A.* 2A:34–1 *et seq.*, specifies the causes for judgments of nullity. In pertinent part it provides:

> Judgments of nullity of marriage may be rendered in all cases, when:
>
> . . . .
>
> d. The parties, or either of them, lacked capacity to marry due to want of understanding because of mental condition, or the influence of intoxicants, drugs, or similar agents; or where there was a lack of mutual assent to the marital relationship; duress; or fraud as to the essentials of marriage; and has not subsequently ratified the marriage.
>
> [*N.J.S.A.* 2A:34–1]

Although plaintiff's complaint for annulment alleges a fraudulent marriage, plaintiff cannot rely on fraud as a ground for annulment. The "fraud" mentioned in paragraph d, *supra*, refers to fraud practiced on a party to the marriage. It has no application where, as here, both parties are knowing participants in a sham marriage.

Paragraph d, however, also provides that a judgment of nullity of marriage may be rendered "where there was a lack of mutual assent to the marital relationship" and the marriage has not been subsequently ratified. *N.J.S.A.* 2A:34–1 d. This provision, added to the statute in 1971, substantially enlarged the statutory grounds for nullity. Prior thereto, paragraph d, in dealing with the question of consent, allowed a judgment of nullity only where the parties or either of them, "were incapable of consenting thereto." *N.J.S.A.* 2A:34–1 (1952 ed.).

██ We conclude that plaintiff's marriage, entered into for the sole purpose of securing permanent residence in the United States, clearly falls within the language of the 1971 amendment to paragraph d. Here, neither of the parties intended to marry, nor did they thereafter enter into any kind of marital relationship with each other. Consequently, plaintiff alleged facts that,

if proven, establish a statutory ground for judgment of nullity of her marriage. See *Ramshardt v. Ballardini*, 129 *N.J.Super.* 445 (Ch.Div.1974). The critical issue whether she should be barred from judicial relief because of her participation in the sham marriage.

■ The doctrine of unclean hands as applied to nullity actions in this State is judge-made and has no statutory basis. In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit. It is noteworthy that our courts have not always recognized the applicability of the doctrine in nullity matters. At one time, the courts of this State took the position that in suits for nullity of marriage contracts which were void under New Jersey statutes, where no property rights were involved, the doctrine of unclean hands, even though otherwise applicable, was subordinate to considerations of public policy which favored judicial declaration of marital status for the protection of public interests. *E.g., Davis v. Green*, 91 *N.J.Eq.* 17, 19–20 (Ch. 1919); *Freda v. Bergman*, 77 *N.J.Eq.* 46, 48–50 (Ch. 1910).

These decisions, however, were overruled in *Tyll v. Keller*, 94 *N.J.Eq.* 426 (E. & A. 1923), and it became the established law of this State that unclean hands was a *per se* bar to a litigant's obtaining a judgment of nullity. *Smith v. Hrzich*, 1 *N.J.* 1 (1948).

In the fifty-seven years since *Tyll* was decided, both the courts and the Legislature have increasingly given recognition to the reality that some marriages die, or never really exist as marriages, and have concluded as a result, that fault should not necessarily be a controlling factor in deciding whether or not to grant relief. As heretofore noted, the 1971 amendments to the divorce and nullity laws enlarged the statutory grounds for judgments of nullity to include situations "where there was a lack of mutual assent to the marital relationship" and the marriage has not been subsequently ratified. *N.J.S.A.* 2A:34–1

d. The same 1971 amendments added the concept of "No Fault Divorce" to the statute by providing an additional ground for divorce—the separation of the parties for at least 18 consecutive months with no reasonable prospect of reconciliation. *N.J.S.A.* 2A:34–2 d. They also abolished recrimination, condonation and the unclean hands doctrine as defenses in a suit for divorce. *N.J.S.A.* 2A:34–7. This last provision is not made applicable to suits for nullity for reasons that are not entirely clear. There is some indication, however, that since the statute, in addition to the enumerated grounds for nullity, also allows judgments of nullity when "[a]llowable under the general equity jurisdiction of the Superior Court," *N.J.S.A.* 2A:34–1 f, it was felt that the equitable defenses should remain to be applied in the discretion of the trial court. *Final Report to the Governor and the Legislature, Divorce Law Study Commission,* 54, 57–60 (May 11, 1970).

Furthermore, this Court in *Chalmers v. Chalmers,* 65 *N.J.* 186, 193–194 (1974), in interpreting the property distribution provision of the 1971 amendments to the divorce laws, held that fault should not be one of the criteria or circumstances that might be taken into account in awarding distribution of the marital property even though the statute speaks in terms of "an equitable distribution." *N.J.S.A.* 2A:34–23.

■ These developments reflect the current attitude of our courts and the Legislature that it does not always further the public interest to have equitable defenses act as a *per se* bar to judicial consideration of questions concerning marital status. We conclude therefore, that *Tyll,* as a hard and fast rule, is unduly harsh and should be modified so as to return discretion to the trial court. Henceforth, it will be permissible to weigh the equities, as well as the public policy in having a person's marital status declared, to the end that uncertainty may be removed from future transactions, rights of inheritance, etc. See *Freda v. Bergman, supra,* 77 *N.J.Eq.* at 48–50.

We recognize that there may be situations where parties to a ceremonial marriage never intend to enter into a meaningful marriage relationship but nevertheless deliberately participate in the rite for the sole purpose of obtaining some tax advantage or other benefit. Such persons may well be considered as legally married. See 52 *Am.Jur.2d*, *Marriage*, § 29. This is not plaintiff's situation, however. Here the parties not only did not intend a meaningful marriage relationship, they did not even intend to create the legal status of a marriage. All they wanted was the production of papers for immigration purposes. We view plaintiff as not so much a willing party to a "marriage of convenience," but rather the victim of unscrupulous persons who preyed on Haitian aliens and, for a price, offered them a means of permanent residence in this country.

The case before us does not involve property rights. The relief which plaintiff seeks will not enhance her standing to claim permanent residence in the United States. All that she asks is that her ceremonial marriage to defendant, which now appears as a matter of public record, be judicially declared to be what it really is—a nullity. In a sense, plaintiff's suit could be considered repentance on her part since she acknowledges her wrongdoing and, in asking to have it undone, may well jeopardize her residential status in this country. Under the facts alleged, the equitable defense of unclean hands must give way to the public interest served by adjudicating plaintiff's marital status. If, on remand, plaintiff offers satisfactory proof of the allegations contained in her complaint, then she will be entitled to have her marriage to defendant annulled.

The judgment of the Appellate Division is accordingly reversed and the matter remanded to the trial court for hearing and disposition in accordance with this opinion.

PASHMAN, J., dissenting.

I agree with most of the majority opinion, and especially with the majority's rejection of *Tyll v. Keller*, 94 *N.J.Eq.* 426

(E & A 1923). The rule that unclean hands is a *per se* bar to an action for annulment should be discarded, leaving discretion with the courts to apply the doctrine only in appropriate cases. I disagree, however, with the way the majority exercises discretion under the facts of this case and with the result it ultimately reaches.

In pursuing its commendable desire to be sympathetic to this plaintiff, the majority has created a precedent that will do mischief when applied to other annulment cases. In addition, the majority has inadvertently confused the matter of determining the legal status of a ceremonial marriage where grounds for annulment may be present. Perhaps the majority's disposition of this case is a consequence of its failure to articulate standards for guiding trial courts in the proper exercise of discretion. Accordingly, I state briefly what I believe those standards should be.

In determining whether unclean hands should bar an action for annulment, a trial court should consider three overlapping areas of equitable considerations: the interests of the parties, the interests of the public, and the integrity of our courts. Besides annulment of the marriage, the parties' interests include obtaining a judicial record of their marital status and dissolving the relationship with fairness to each party, especially where property rights are at issue, *see, e.g., Kazin v. Kazin*, 81 *N.J.* 85 (1979). The interests of the public for the most part concern clarification of the parties' marital status. Legality of future marriages, interests in property, rights to intestate succession, and calculation of tax obligations, among other questions, can all depend on the status of prior marriages. Thus the public has a strong interest in judicial clarification of uncertain marital status. In addition, the public has interests in allowing dead marriages to be terminated, Divorce Law Study Commission, *Final Report to the Governor and the Legislature* 1–7, 72 (May 11, 1970), and in preserving the solemnity of marriage relationships. Finally, the need to maintain the integrity of our courts mandates that they not be used in ways that engender public

cynicism or contempt. Our courts should not unquestioningly nullify a marriage at the request of the parties where annulment would further the parties' illegal schemes.

In some cases one of the interests will far outweigh the others and require a judgment of annulment despite opposing considerations. For example, where the ground of a bigamous marriage under *N.J.S.A.* 2A:34–1(a) has been proved and no property rights are at issue, the public's interest in clarifying the marital status of the parties will normally outweigh any other considerations. *See Johnson v. Johnson*, 245 *Ala.* 145, 16 *So.*2d 401 (1944); *Anderson v. Anderson*, 27 *Conn.Sup.* 342, 238 *A.*2d 45 (Superior Ct. 1967); *Jardine v. Jardine*, 291 *Ill.App.* 152, 9 *N.E.*2d 645 (1937). Potential future spouses, heirs, governments and other all have a strong interest in official and definitive clarification of the marital status. In contrast, where a marriage involves important economic interests in distribution of property, the public's interest in clarification of marital status may be outweighed by the parties' interests in an economically fair dissolution of the marriage. *Cf. Kazin v. Kazin, supra* (husband in divorce action who previously helped obtain illegal divorce for wife estopped from denying validity of bigamous marriage in order to avoid financial obligations).

The public interest in clarification will be strongest where the marriage is void from its inception and technically does not exist under law. *See Flaxman v. Flaxman*, 57 *N.J.* 458, 461 (1971). However, despite its recognition of this interest, *ante* at 513, the majority obscures the question of how the legal status of ceremonial marriages can be determined prior to a judicial ruling, where grounds for annulment may be present. It concedes that persons participating in a marriage ceremony "for the sole purpose of obtaining some tax advantage or other benefit," where the ground of lack of mutual assent under *N.J.S.A.* 2A:34–1(d) can presumably be shown, "may well be considered as legally married." *Ante* at 513. But by contrasting such marriages with the one in this case, the majority also suggests that a marriage may have no legal existence where, as here, the

same lack of mutual assent is present but circumstances happen to be more sympathetic. I fear that this reliance on how sympathetic the immediate circumstances of a case are to determine the legal status of a ceremonial marriage will add further confusion to this already uncertain and problematic area of the law. Instead, I would rely on the provisions of the annulment statute itself, *N.J.S.A.* 2A:34–1, and determine the legal status of a marriage on the basis of whether it was void from inception or merely voidable by judicial action. *See Flaxman, supra.*

The clearest example of a marriage void from its inception is a bigamous one, which cannot subsequently be ratified by the parties. *See N.J.S.A.* 2A:34–1(a). In contrast, marriages, such as the one in this case, that can be ratified or confirmed by the parties, *see N.J.S.A.* 2A:34–1(c)–(e), are not void from their inception but require judicial action to be terminated. Denial of annulment of such voidable marriages will not create uncertainty about the parties' marital status; they will be married until proper grounds for judicial dissolution have been proved in court under our matrimonial laws. Therefore, the public interest in clarification will not be as important as where the marriage was void from inception.

Turning to this case, plaintiff cannot allege that her marriage to defendant was void from its inception. Although the parties never intended to enter any kind of marital relationship, thus making lack of mutual assent a proper ground for annulment under *N.J.S.A.* 2A:34–1(d), the marriage could have been ratified by the parties. Consequently, the existence of the marriage is not presently in doubt; judicial action is necessary to terminate it. Each of the above equitable considerations must therefore be weighed by the Court.

The interest of the parties in dissolving a dead marriage is not an overriding consideration here because of the availability of the "no-fault" ground for divorce based on 18 months' separation, *N.J.S.A.* 2A:34–2(d). Judicial denial of annulment will not permanently lock the parties into a marriage dead in all respects

except its legal status. Plaintiff can still obtain a divorce and thus extricate herself from some of the troubles created by her efforts to gain permanent resident status in the United States.

A more important consideration in this case is the public's interest in preserving the solemnity of the institution of marriage. This interest requires that the law not accommodate sham marriages entered into with the sole intent of effectuating a temporary illegal purpose, especially where, as here, the Legislature has already provided another means for terminating dead marriages by enacting the no-fault ground for divorce. But the no-fault ground requires a waiting period before dissolution of the marriage, which serves the salutary purpose of reflecting the careful thought that must accompany any decision to dissolve a marriage. Divorce Law Study Commission, *supra*, at 114, 128, and indirectly the solemnity that must accompany any decision to marry.

Finally, another consideration not addressed by the majority is the adverse effect that facilitating annulment in this case will have on judicial integrity. Plaintiff knowingly engaged in a scheme to violate federal immigration laws through a sham marriage ceremony. While it should not be the aim of our matrimonial courts to punish her for violations of federal law, our courts should not make their powers readily available to those who would use them to further illegal schemes. The knowledge that courts may not be willing to nullify sham marriages at the behest of the parties may serve to deter such marriages and to preserve both the integrity of our courts and the solemnity of marriage relationships.

While in many other factual situations unclean hands should not bar annulment, the balance of equitable considerations in this case weighs against plaintiff. Judicial discretion would be better exercised by denying this application for annulment.

I would affirm the judgment of the Appellate Division.

518

*For reversal and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance*—Justice PASHMAN—1.