KISHON PRITCHARD, Petitioner

v.

ROBERT PURCELL, Respondent

High Court of American Samoa
Trial Division

DR No. 65-88

April 18, 1989

Before REES, Associate Judge, and TAUANU'U, Chief Associate Judge.

Counsel: For Petitioner, Charles Ala'ilima

This action is for annulment of a marriage. Respondent was served in New Zealand by certified mail and has not answered.

Petitioner testified that in 1984 she asked respondent to marry her for the sole purpose of obtaining permanent resident status in New Zealand. She further testified that she gave respondent money in exchange for his participation in the fraudulent marriage; that neither party intended, at the time of the ceremony, to "consummate" the marriage; that they never did have sexual relations; and that they did not live together.

Petitioner says she purchased a house and a car which were registered in the names of both parties. According to her petition, the acquisition of these properties was "intended to establish the validity of the marriage before the New Zealand authorities." Her testimony, although not entirely clear, appears to be that she lived alone in the house but that she and respondent shared the use of the car. When she left New Zealand in 1986, respondent took over possession of the house and car.

Upon her departure from New Zealand, petitioner asked respondent to bring an action for divorce as per their earlier agreement. He refused, however, to bring such an action.

Petitioner testified that respondent is happy with the existing arrangement, apparently because he enjoys the house and car.[1] Petitioner says she now

---

[1] There is some tension between petitioner's testimony and her pleading, which states that "[t]he properties have, by agreement of the parties, been placed for sale with the proceeds to be divided equally." The petition also states that

"understands that her acts in New Zealand were wrong and prays this Court forgive this youthful indiscretion."

Although the power of forgiveness is reserved to another forum, this Court has the authority to declare a marriage null provided that it "was illegally contracted." A.S.C.A. § 42.0203. It is by no means clear, however, that a marriage was "illegally contracted" simply because the parties entered into it for an illegal reason.

### I. Consent to Marry

Marriage ceremonies conducted with the sole purpose of deceiving immigration officials are lamentably common. Although courts of the United States have construed the immigration laws so as to deny such ceremonies their desired effect, these courts have frequently taken care to acknowledge that the ceremony may change the parties' marital status even if it does not change their immigration status. See, e.g., Lutwak v. United States, 344 U.S. 604 (1953); United States v. Lozano, 511 F.2d 1 (7th Cir. 1975); United States v. Sacco, 428 F.2d 264 (9th Cir. 1970); Mpiliris v. Hellenic Lines, Ltd., 323 F.Supp. 865, 882 n.2 (S.D. Tex. 1969).

"Immigration marriage" is a special instance of the "limited purpose marriage" in which two people, at least one of whom does not really want to be married, nevertheless very much want something that can be obtained through marriage. It is often agreed in advance that one of the parties, after the ceremony and the attainment of the desired object, will bring an action for annulment. A substantial majority of the reported decisions dealing directly with the question, however, have concluded that such marriages----

---

respondent was believed to be residing in Hawaii. As it turned out, on December 24, 1988, he signed a certified mail receipt in New Zealand. If, however, petitioner believed respondent to be living in Hawaii and to have agreed to an amicable disposition of the property, it is difficult to understand how she could also believe that he was unwilling to divorce her only because he wished to remain in possession of the New Zealand property. On this evidence we cannot conclude with any confidence that respondent does not have some more conventional reason for wishing to remain married, or that the marriage itself was not more conventional than petitioner now represents.

whether or not they are effective in achieving their purposes --- are valid as marriages.

> [B]y reason of the strong social interests in protecting the integrity of the marital status, when two persons, otherwise qualified voluntarily go through a marriage ceremony, albeit for a limited purpose, with the intention, mutual understanding and anticipation that the marriage is to be accorded legal significance, the marriage is binding . . . .

Mpiliris, supra, 323 F.Supp. at 880-81 ("immigration marriage"). See also Re Estate of Duncan, 285 P. 757 (Colo. 1930) ("trial marriage"); Schibi v. Schibi, 69 A.2d 831 (Conn. 1949) (marriage ceremony conducted solely "to give the child a name"); Mitchell v. Mitchell, 310 A.2d 837 (D.C. 1973) (legitimation of child); Hanson v. Hanson, 191 N.E. 673 (Mass. 1934) (ceremony conducted to avoid loss of employment by man whose salary had been raised on the strength of his approaching marriage); Erickson v. Erickson, 48 N.Y.S. 693 (N.Y. App. 1944) (legitimation of unborn child); Campbell v. Moore, 1 S.E.2d 784 (S.C. 1939) (legitimation); Harding v. Harding, 118 P.2d 789 (Wash. 1941) ("It was a business proposition. I had been in this water district for a good many years, had good connections, and we figured that we could make a go together."). Cf. Lozano, supra, 511 F.2d at 3 (immigration); Sacco, supra, 428 F.2d at 269-70 (legitimation); United States v. Diogo, 320 F.2d 898 (2d Cir. 1963) (immigration).[2]

A few courts have held, however, that a "limited purpose" marriage is invalid in the

---

[2] Since this marriage was contracted in New Zealand, its validity or nullity depends on New Zealand law. Loughran v. Loughran, 292 U.S. 216 (1934). Counsel for petitioner has cited no New Zealand authorities, so the applicable law is presumed not to differ from that of the forum. See Hanson v. Hanson, supra, 191 N.E. at 674-75; Theo H. Davies & Co. v. Pacific Development Co., 6 A.S.R.2d 5 (1987). We do note that the English rule with regard to limited purpose marriages seems to be identical to the majority American rule, with which we concur. See H. Clark, The Law of Domestic Relations in the United States § 2.18 at 115-16 & n.8 (1968) and authorities cited therein. Even if the petitioner could prove her marriage to be void under New Zealand law, however, her action in this Court would be subject to such equitable defenses and limitations as are applicable to annulment actions in American Samoa. See Part II infra.

19

absence of subsequent cohabitation or sexual intercourse between the parties. See Stone v. Stone, 32 So.2d 278 (Fla. 1947) (legitimation); Faustin v. Lewis, 427 A.2d 1105 (N.J. 1981) (immigration); Ramshardt v. Ballardini, 324 A.2d 69 (N.J. Ch. 1974) (immigration). These decisions seem to depend partly on an expansive definition of "consent," and partly on an apparent misapplication of the idea that a defective marriage can be "ratified" by sexual relations.

Marriage, being a sort of contract, requires the consent of the parties. When one party undergoes the proceeding at the point of a gun, or under a delusion that the ceremony is something other than a wedding, or in a state of dementia or extreme intoxication such as would render assent impossible, there is no consent and hence no marriage.[3] This principle has sometimes been extended to cases in which "two people participate in a mock marriage ceremony as the result of jest, exuberance, hilarity or dare and harbor no intention to be bound thereby." Mpiliris, supra, 323 F. Supp. at 881.[4]

---

[3] See, e.g., Fowler v. Fowler, 60 So. 694 (La. 1913) ("[P]laintiff was coerced by a threat of death as the alternative to enter into the contract . . . . The alleged ratification was clearly the result of the same form of coercion as that which was originally applied, and produced no better result."); Clark v. Field, 13 Vt. 460, discussed in Hanson, supra, 191 N.E. at 675 ("[A] marriage, entered into under the mistaken belief by the bride that the ceremony was merely one of engagement and that a later ceremony of marriage would be held in the future, was annulled."); Montgomery v. U'Nertle, 122 A. 357 (Md. 1923): ("[A]t the close of the evening performance these two young men . . . met the chorus girls as they came out from the show . . . . [They] had had some drinks and were to a greater or less extent under the influence of liquor. It was then and there proposed that Montgomery and Miss U'Nertle should be married that night . . . . Accordingly they next went to the Bellevue Stratford Hotel and perhaps while there had some light refreshments. The night was an extremely cold one, the thermometer being at or near the zero point, and accordingly the party then went and obtained some moonshine liquor, to the amount of between two and three quarts of which the young men partook. . . . Miss U'Nertle was exceedingly strong for the marriage . . . . Mr. Montgomery at this time was . . . too drunk to know just what did happen . . . . As to whether he was held up during the propounding and answering of these [marriage license] questions, is affirmed by the chauffeur Simmons . . . .").

[4] See Meredith v. Shakespeare, 122 S.E. 520 (W. Va. 1924):
[W]hile on their automobile ride, and while passing an old and abandoned farm house along the road, plaintiff observing the house, but purely by way of jest, suggested to defendant that they return to town, get married and go back and live in the abandoned house; . .

The jest-marriage doctrine has been cited to support the view that parties who enter into marriage with a limited or special purpose have not truly consented to the marriage.[5] Unlike the

. later . . . some one of the party, in a spirit of banter and jest again brought up the subject and demanded that they carry out the joke, and that plaintiff and defendant joining in the spirit thereof, with their young friends proceeded to obtain a marriage license and a ring, and in the highest of spirits and with great fun and laughter proceeded to the church, where the ceremony was performed . . . .

Id. at 521. See also Davis v. Davis, 175 A. 574 (Conn. 1934):

The plaintiff and the defendant went on an automobile ride with several young people. It was a joyous occasion, and to add to the excitement the defendant dared the plaintiff to marry her. The plaintiff accepted the dare . . . .

Id. at 574-75.

It is hard to know what to make of the "marriage in jest" cases. The decisions leave the impression that important facts have been left unstated; this impression arises, if for no other reason, from the difficulty of imagining that two people would think such a joke funny enough to be worth the trouble. Perhaps matrimonial joyriding was a Roaring Twenties fad akin to goldfish swallowing; or perhaps the joy, hilarity, excitement, and banter said to have animated these proceedings should be understood as Prohibition-era code words for extreme intoxication sufficient to vitiate assent.
The jest decisions would make sense at face value if marriage were nothing but a private contract between two parties. They seem inconsistent, however, with the oft-stated observation that society is an interested party in every marriage. Parties to marriage contracts are routinely denied some of the basic attributes of contractual freedom, such as the power to make their legal relationship terminable at will or to limit its scope and duration, all on account of what are thought to be the strong social interests in the solemnity and stability of marriage. Yet the only conceivable point of undergoing a "mock" marriage ceremony with a real marriage license before a real magistrate or minister of religion would be to flout these interests. Society, like the goldfish, is no position to take comfort from the parties' private understanding that all is in fun. See Hand v. Berry, 154 S.E. 239 (Ga. 1930) (Marriage entered into "in a spirit of fun, braggadocio, and levity" after automobile ride was valid, since there was no fraud by either party against the other; "[s]ociety in general is interested in all marriage contracts, and therefore they cannot be set aside lightly and without cause.")

[5] The ceremony in Dorgeloh v. Murtha, 156 N.Y.S. 181 (N.Y. App. 1915) was treated by the Court as a "jest" marriage although its actual purpose was to enable the bride to obtain employment. See also United States v. Rubenstein, 151 F.2d 915 (2d Cir. 1945).

parties to a jest marriage, however, the parties to a limited purpose marriage specifically do intend that their marriage should have at least some of the legal and practical effects of a marriage. In contracting marriage they would seem to have made a deliberate decision to accept the marital status with all its legal consequences in order to obtain the consequences they particularly desire. In the formation of contracts it often happens that a party wants only some of the effects of his contract and would, if he could, avoid the rest. And yet the law understands him to have consented to the whole contract, even the parts he did not really want.

Those few decisions declaring limited purpose marriages to be nullities have invariably stressed the absence of sexual relations between the parties subsequent to the ceremony. The idea seems to be that the parties have not consented to marriage unless they have consented to a "real" marriage.[6] And yet neither cohabitation nor "consummation" has traditionally been held essential to the validity of a marriage.

The presence or absence of sexual relations is generally relevant to an annulment action only as evidence of "ratification". A party whose consent to marriage was procured by fraud or duress, or who lacked the capacity to consent, may cure this defect by engaging in voluntary sexual relations after the fraud, duress, or lack of capacity has come to an end. See generally H. Clark, The Law of Domestic Relations in the United States §§ 2.15-.17. Or a refusal by one party to engage in sexual relations or live with the other party might be evidence of a secret pre-marital intention by that party to limit the marital relationship; such a intention (if and only if it was not disclosed to the other party prior to the ceremony) might itself be a fraudulent inducement to marry, giving the defrauded party a right of action for annulment.

---

[6] See Ramshardt, supra, 324 A.2d at 70 ("[A]lthough the parties intended a valid marriage ceremony, they in no way intended a valid 'marital relationship' . . . ."); Stone, supra, 32 So.2d at 279 ("Such pretended marriages as these, while they may be laudible [sic] . . . thinking of the interest of the innocent unborn child, are contrary to public policy and are without the sacred elements on which the estate of matrimony is founded. The courts should not hesitate to annul such marriages . . . on clear and unequivocal proof . . . that the marriage status was never consummated by any cohabitation.").

22

See, e.g., Anders v. Anders, 113 N.E. 203 (Mass. 1916). A marriage contracted between two people who mutually agree not to cohabit or to engage in sexual relations, however, or even in the mutual knowledge that one party is unable to engage in such relations, is not on that account invalid. See, e.g., Samuelson v. Samuelson, 142 A. 97 (Md. 1928); Martin v. Otis, 124 N.E. 294 (Mass. 1919).

To wrench "consummation" from its context to serve as the test of validity for limited purpose marriages creates a host of practical and theoretical problems. In the first place, cases such as the one before us almost by definition involve people who have shown a willingness to perjure themselves. The testimony of such a person on the occurrence vel non of an almost uniquely unverifiable event is not the sort of evidence on which courts ordinarily feel comfortable deciding cases. And yet courts are said to have a special responsibility not to annul marriages except on "clear, satisfactory and convincing evidence."[7]

Even more important, the substantive distinction created by the consummation test makes no sense. Many of the couples who contract marriages for immigration purposes or other special reasons, without the slightest intention of

---

[7] Maduro v. Maduro, 145 P.2d 683, 684 (Cal. 1944); see Schibi, supra, 69 A.2d at 197; A.S.C.A. § 42.0205 (Court must "examine all parties and witnesses and . . . take all evidence, as far as it reasonably can" in order to draw its own conclusions on the merits).

The necessity of strict proof is said to be at its strongest in uncontested cases. Schibi, supra, 69 A.2d at 197 ("Since the case was uncontested, it was particularly incumbent upon the trial court to satisfy itself fully that the plaintiff had sustained the burden of proving the lack of mutual consent which [s]he claimed vitiated the marriage."). This is because in actions for the dissolution of marriage, unlike ordinary civil actions, the law does not permit judgment by stipulation. See A.S.C.A. § 42.0206. Moreover, the presumption that two people who went through a marriage ceremony gave their mutual consent to enter into the marital status "is considered to be one of the strongest recognized by law." Mpiliris, supra, 323 F.Supp. at 880. Although the presumption is rebuttable, "marriage contracts will not be dissolved except for the soundest of reasons and upon the strictest of proof." Carr v. Carr, 82 F.Supp. 398, 398-99 (D.D.C. 1949).

Application of this rigorous standard to petitioner's testimony would entail not only an evaluation of her demeanor on the witness stand but also some recognition of her role in the sustained and elaborate fraud upon the New Zealand government that gave rise to the situation from which she now seeks to extricate herself. See also note 1 supra. Because we believe the law not to depend on cohabitation or "consummation," we make no finding on this question.

spending their lives together, are no doubt fond of each other. Assuming the correctness of the premise that the law should look behind their sworn consent to marry --- and that they are found to have specifically intended something other than a "true" marriage --- should the law then, upon encountering a single act of sexual intercourse, forego further inquiry and irrebuttably presume that the parties must have thought better of their plan?

Cohabitation is even more unrealistic than consummation as a test of whether limited purpose consent has become true consent. If the present petitioner and respondent had lived together for a few weeks to lend verisimilitude to their immigration project, parting forever on the day petitioner received her visa, any inference of consent (beyond the "limited purpose consent" given at the time of the ceremony) would be an inference contrary to fact.

This is not to say that cohabitation and sexual relations cannot be important evidence of the parties' intentions. In marriages to which one party's consent was vitiated because he or she was the victim of fraud or duress, later voluntary cohabitation and sexual relations are strong objective evidence of forgiveness --- evidence that the victim has freely chosen the status into which he was originally led by force or fraud. Where the parties were co-perpetrators of the fraud, however, neither has anything for which to forgive the other. In this context sexual relations and brief cohabitation are not particularly strong evidence of a change of heart.

It is always possible, of course, that a couple who marry for a limited or special purpose might later decide to remain together for more traditional reasons. Assuming that such reformed marriages should be regarded as valid notwithstanding their origins, there is one thing to be said for the consummation test: it might be more practical for courts to decide whether sex or cohabitation had occurred than whether the parties ever really came to love each other.[8]

---

[8] Cf. R. Pascal, Louisiana Family Law Course § 4.15 at 56 (1973): "Canon law would treat the [limited purpose] marriage as null for lack of intent to contract true marriage. But the canon

24

It is even more practical, however --- less likely to lead to uncertainty, less consumptive of judicial resources, and more consistent with what the law generally means by consent --- simply to abide by the majority rule. Provided that the parties understood what a marriage ceremony was when they procured one, and that neither was a victim of force or fraud, their vows and affidavits should be given the legal significance they knew society meant them to have, rather than the different and contrary effect they secretly preferred.

Petitioner and respondent freely chose to contract a legal marriage. They were free to agree whether to live together or not, to have sexual relations or not, to enjoy or forego other privileges of their marital status. The status itself, and the obligations attached to it by law, are terminable only in accordance with the divorce statute.

## II. Clean Hands

Not everyone who is a party to a defective marriage is entitled to an annulment. In providing that the Court "may" annul illegally contracted marriages, A.S.C.A. § 42.0203 follows the general rule that annulment is an equitable remedy which may be barred by equitable defenses including estoppel, laches, or the doctrine of unclean hands. See, e.g., Schotte v. Schotte, 21 Cal. Rptr. 220 (Cal. App. 1962); Tonti v. Chadwick, 64 A.2d 436 (N.J. 1949); Commonwealth v. Case, 189 A.2d 756 (Penn. 1963); Gress v. Gress, 209 S.W.2d 1003 (Tex. App. 1948).

In cases involving bigamous or incestuous marriages some jurisdictions have refused to apply the doctrines of estoppel and unclean hands. In such cases the court generally considers the private equities of the case relatively unimportant compared to the overarching social interest in proscribing bigamy or incest. See Simmons v. Simmons, 19 F.2d 690, 691 (D.C. Cir. 1927): "The interest of the state extends beyond the interests of the parties . . . . It refuses to countenance

---

law has the advantage of a procedure more suitable than ours for the discovery of actual intent."

the continued perpetration of crime between such parties in violation of law and good morals." See also, e.g., Johnson v. Johnson, 16 So.2d 401 (Ala. 1944); Townsend v. Morgan, 63 A.2d 743 (Md. 1949); Martin v. Martin, 46 S.E. 120 (W.Va. 1903). Many jurisdictions, however, apply the doctrines of estoppel and unclean hands to bar annulments even of such "absolutely void" marriages. See, e.g., Case, supra; Schotte, supra; Endres v. Grove, 111 A.2d 638 (N.J. Ch. 1955).

Where the marriage is not absolutely void but merely "voidable," as in cases of defective consent, equitable barriers to recovery do apply. See, e.g., Gress, supra, 209 S.W.2d at 1007 (estoppel); Payzant v. Payzant, 168 N.E. 168 (Mass. 1929) (unclean hands); Jwaideh v. Jwaideh, 140 A.2d 303 (D.C. 1958) (laches).[9] Even the few cases declaring limited purpose marriages invalid seem to recognize that annulment of such marriages might ordinarily be barred by equitable defenses. In Ramshardt, supra, the court held the doctrine of unclean hands inapplicable only because plaintiff had shown his "innocence of any intentional violation of law" by voluntarily reporting his fraudulent marriage to the immigration authorities soon after it occurred. Id., 324 A.2d at 71. In Faustin, supra, the court acknowledged the applicability of the doctrine but found plaintiff to be "not so much a willing party to a 'marriage of convenience,' but rather the victim of unscrupulous persons who preyed on Haitian aliens . . . ." Id., 427 A.2d at 1108. See also Stone, supra, 32 So.2d at 278-79 (Plaintiff, who had acted from "laudible" motives in marrying a pregnant teenager when the father of her unborn child "had become involved in other trouble and was not available," was entitled to an annulment, although the father himself would not have been so entitled.).

_____

[9] Since a voidable marriage can generally be annulled only at the instance of the "innocent" party, a petitioner with unclean hands or estoppel would seldom have a right of action in the first place. Indeed, this is an independent rationale for denying annulment of limited purpose marriages. See Mitchell, supra, 310 A.2d at 841, quoting Erickson, supra, at 589-90: "If a fraud has occurred, they are the parties who purposely and intentionally brought it about"; therefore the parties had no right of action under a statute defining marriages as voidable for defective consent. Cf. Appeal of O'Rourke, 246 N.W. 461, 462: "[S]ince no Minnesota or Iowa statute declares a limited purpose marriage void ab initio, Kathleen's marriage was at most voidable . . . . [and] may not be collaterally attacked."

Even if we agreed with petitioner that her marriage was voidable, this case calls so strongly for the application of the doctrine of unclean hands that we would regard it as an abuse of our discretion to grant her petition. Although she was young at the time of the arrangement from which she now seeks relief, she was its architect. Although she now says she is sorry, this case does not involve a wrongdoer moved by remorse to bring a premature end to his wrongful scheme, nor even one who has tired of it. On the contrary, the Court was always part of the plan. Parts One and Two--- arranging a marriage and staying in New Zealand until petitioner wished to leave --- seem to have gone well. By acquiescing in its designation as Part Three, this Court would countenance an abuse of its own processes: granting an annulment in this case would be the juridical equivalent of driving the getaway car. Moreover, a rule that marriages contracted for immigration purposes will be cheerfully annulled, no questions or only one question asked, would surely encourage many similar frauds. This is not what we are here for.

Accordingly, the petition is denied.