**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3448-23

NEEL H. PATEL,

    Plaintiff-Appellant,

v.

BHOOMIKA PATEL,

    Defendant-Respondent.

_____

> Argued March 12, 2025 – Decided March 25, 2025
>
> Before Judges Mayer and Puglisi.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-0928-23.
>
> Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael Confusione, on the briefs).
>
> Ruchika S. Hira argued the cause for respondent (Hira & Strlovski, LLC, attorneys; Ruchika S. Hira, of counsel and on the brief).

PER CURIAM

Plaintiff Neel H. Patel appeals from a June 14, 2024 judgment of divorce granted to defendant Bhoomika Patel based on irreconcilable differences. Plaintiff focuses his argument on the Family Part judge's denial of his request for an annulment of the marriage. We affirm.

Plaintiff sought an annulment, alleging defendant committed fraud based on misrepresentations before, during, and after the marriage. He also claimed defendant fraudulently married him for the sole purpose of obtaining a green card to enter the United States. Defendant opposed the annulment and counterclaimed for divorce based on irreconcilable differences.

We summarize the facts from the testimony proffered by plaintiff's witnesses.[1] In September 2019, plaintiff and defendant met through a dating website. In her dating profile, defendant described herself as a "fun- loving person with a right mix of modern and traditional cultures." At that time, plaintiff lived in the United States and defendant lived in India.

The parties continued communicating for several months. In January 2020, plaintiff and his parents traveled to India to meet defendant and her family. The parties were engaged in February 2020. Plaintiff returned to India to marry

---

[1] Defendant proffered no testimony because the judge denied plaintiff's request for an annulment at the close of plaintiff's proofs, finding plaintiff failed to meet his burden of proving fraud sufficient to support an annulment of the marriage.

A-3448-23

defendant in a civil ceremony on December 8, 2020.  They lived separate and apart until they could be married in a religious ceremony in India on November 28, 2021.

In seeking an annulment, plaintiff testified there were various "red flags" and purported misrepresentations by defendant from the time they met until they separated in September 2022.

The first "red flag" involved defendant's date of birth.  Plaintiff testified defendant's dating application stated her date of birth as July 1, 1995.  Plaintiff learned prior to the engagement that defendant's actual birthday was July 26, 1995.  According to plaintiff, the parties' actual birth dates were important because he read a horoscope suggesting a marriage between two people with their specific birth dates would end in divorce.

Next, before plaintiff and defendant were engaged, they allegedly discussed divorce.  Plaintiff told defendant divorce was not an option for him unless "crazy things" happened or there was physical abuse.  Defendant responded fights between married couples happened but "[c]heating should not happen."

At trial, plaintiff testified no one in his family ever divorced.  However, on cross-examination, plaintiff conceded his mother's brother divorced at least

3

once. Plaintiff testified the circumstances leading to his maternal uncle's divorce were akin to his own situation because his uncle's first wife married the uncle to obtain a green card. Plaintiff also learned defendant's brother divorced and remarried.

The next "red flag" involved having children. Before the engagement, plaintiff and defendant discussed starting a family. Defendant told plaintiff she wanted two children: a boy and a girl. At the trial, plaintiff testified defendant recanted and stated she did not want children. However, on cross-examination, plaintiff conceded defendant only said it was not the right time to start a family, not that she no longer wanted to have children.

The next "red flag" occurred after the parties' engagement but before their civil marriage ceremony. According to plaintiff, he confronted defendant about her caste status as a "Patel." In response, defendant stated she was a "Patel" even though her last name was not "Patel." Plaintiff also discovered defendant's sister married someone "out of caste."

Another "red flag" involved plaintiff's discovery that defendant's family did not participate in the traditional customs for celebrating Diwali. Plaintiff learned this information after the engagement but before the civil marriage ceremony.

 A-3448-23

In August 2021, after the civil ceremony but before the religious ceremony, plaintiff asked defendant if she married him to obtain a green card. Defendant said "no." During cross-examination, plaintiff testified defendant claimed she did not need to marry him because she could obtain a student visa to enter the United States.

Also in between the civil ceremony but before the religious ceremony, the parties filed an application with the United States Citizenship and Immigration Services so defendant could live in the United States. While the application was pending, plaintiff lived in New Jersey and defendant remained in India.

In October 2021, plaintiff told his parents he had second thoughts about the religious marriage based on defendant's various misrepresentations. According to plaintiff, his parents reassured him everything with defendant would be all right after the religious marriage ceremony.

Around this same time, plaintiff asked defendant if she would sign a prenuptial agreement prior to the religious ceremony. Defendant got upset and there were no further discussions regarding a prenuptial agreement. Plaintiff described this incident as another "red flag."

Plaintiff's best friend of nearly thirty years, Arth Shah, testified at trial. Shah planned to attend the parties' religious ceremony. During the pre-marriage

5

festivities, Shah explained he overheard defendant say: "[I]t's going to be a matter of months before I move to America."  At trial, Shah acknowledged this statement "could be interpreted in a lot of ways."  However, Shah testified he interpreted defendant's statement as "a red flag."

Before the religious ceremony, Shah told plaintiff about defendant's statement.  Shah testified he was suspicious of defendant's statement and tried to "warn" plaintiff to act on the suspicion.  According to Shah, plaintiff rebuffed him.  After Shah and plaintiff "went back and forth multiple times," Shah told plaintiff he was "not going to attend [plaintiff's] wedding if [plaintiff was] going to . . . behave like this or not take any action."  After this conversation, Shah decided not to attend the wedding.

Despite these "red flags," plaintiff married defendant in a religious ceremony in India on November 28, 2021.  Plaintiff then returned to the United States while defendant stayed in India.

Even though they were not living in the same household, the couple started to argue in January 2022.  At first, plaintiff thought the arguments were normal but later believed defendant started the arguments to be able to assert abuse allegations against him.

6

Defendant received her visa to travel to the United States in April 2022. Plaintiff traveled to India to bring defendant to the United States. The couple lived with plaintiff's parents in New Jersey. After arriving in New Jersey, plaintiff and his father testified defendant's demeanor changed. According to plaintiff, defendant disrespected his parents, no longer wanted to have children, and expressed her opinions on various topics even though she had not been asked to do so.

After defendant's green card arrived in July 2022, plaintiff testified defendant became a different person and the couple argued frequently about "stupid" things.

In September 2022, the parties agreed they needed some space and decided to separate. Plaintiff purchased a one-way ticket for defendant to travel to North Carolina. At no time did defendant asked plaintiff for a divorce.

Six months after they separated, plaintiff filed a complaint to annul the marriage. At trial, plaintiff testified he felt "stupid," and should have acted in sooner in response to all the "red flags." He told the judge defendant committed fraud by making various misrepresentations to him before and during the marriage. Plaintiff also claimed defendant only married him to obtain her green card and that was her plan from the moment they began dating.

7

The Family Part judge heard the trial testimony over two days in June 2024. Plaintiff proffered the testimony of his father, Shah, and Jenna Bekka, a friend who spent time visiting with plaintiff and defendant in Canada and the United States.

In addition, plaintiff testified on his own behalf. Despite the lack of direct examination questions from plaintiff's counsel, the judge permitted plaintiff's lengthy responses in the absence of pending questions from his attorney.

During his testimony, plaintiff frequently interrupted the judge's efforts to curtail his drawn-out responses. On the multiple occasions, when the judge attempted to focus plaintiff's testimony, plaintiff retorted, "this is my life."

At the conclusion of the testimony and after hearing legal argument from plaintiff's counsel, the judge found plaintiff failed to meet his burden of proving the marriage was fraudulent to warrant annulment, but found his testimony sufficient to satisfy defendant's cause of action for divorce based on irreconcilable differences.

The judge accepted plaintiff's personal belief "that there was fraud that was perpetrated on him by defendant." However, as the judge explained, plaintiff refused to "accept that his marriage may have ended. He d[id]n't accept

that some of his own actions or the actions of his family may have contributed to the marriage ending."

The judge recited the various "red flags" identified by plaintiff during his testimony. She expressly rejected plaintiff's claim that defendant plotted to leave the marriage after obtaining a green card. As the judge noted, "plaintiff has repeatedly stated that the defendant has never said from her own mouth that she wants to end the relationship and, in fact, it [was] the plaintiff who filed for divorce."

The judge acknowledged plaintiff's testimony that an annulment was "deeply important to him" but explained "there [was] a compulsion or idea that the defendant be 'punished' for ending the marriage." The judge stated, "the facts [we]ren't adding up to what the plaintiff believe[d] happened." She concluded plaintiff minimized his own actions contributing to the demise of the marriage. Based on the testimony, the judge found plaintiff failed to prove marital fraud for an annulment.

On appeal, plaintiff contends the judge erred in denying an annulment because defendant committed fraud and only married him to obtain a green card. We disagree.

Because the Family Part judge's decision concerns a question of law, we review the matter de novo. Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017). N.J.S.A. 2A:34-1 sets forth the causes for judgments of nullity of a marriage. One of the grounds for nullifying a marriage is fraud. N.J.S.A. 2A:34-1(d). The Family Part, as a court of equity, has jurisdiction to annul a fraudulent marriage contract. V.J.S. v. M.J.B., 249 N.J. Super. 318, 320 (Ch. Div. 1991). "[A] determination of whether a fraud goes to the essential of the marriage must be decided on a case-by-case basis." Ibid.

Here, the only cause for nullity in plaintiff's verified complaint is governed by subsection (d) of the statute. The subsection, in relevant part, permits nullity where there is "fraud as to the essentials of marriage," and either or both of the parties have "not subsequently ratified the marriage." N.J.S.A. 2A:34-1(d).

Our courts have rejected the annulment of a marriage in a variety of contexts. In Woodward v. Heichelbech, 97 N.J. Eq. 253, 257 (Ch. 1925), the judge found untrue statements by the prospective husband regarding his financial status were insufficient to warrant annulment of an unconsummated marriage on the ground of fraud. As the Woodward judge wrote:

> Courts are not designed to assist those, sui juris, who
> make stupid contracts. If the petitioner married for

money (and she certainly did not marry for love), she made a bad bargain. Unfortunately, that in itself is no ground for relief under the circumstances of this case. A sound policy requires a far greater wrong than has been shown to dissolve a contract so peculiar as that of marriage, whether consummated of not.

[Id. at 258]

In Rhoades v. Rhoades, 10 N.J. Super. 432, 435 (App. Div. 1950), we held the plaintiff's false representation prior to marriage that she had borne a child to the defendant was not fraudulent. We determined "[a] court should not annul a marriage on the ground of fraud except in extreme cases, where the particular fraud goes to the very essence of the marriage." Id. at 438. "[A] mistake, whether resulting from accident, or in general fraudulent practices, in respect to character, fortune, health, or the like, does not render void what is done. A man who means to act upon such representations should verify them by his own inquiries." Ibid.

In Patel v. Navitlal, 265 N.J. Super. 404-05 (Ch. Div. 1992), the judge denied the husband's application for annulment of the marriage because he failed to prove the wife married him solely to gain entry to the United States. The parties in Patel first married in a civil ceremony in India and applied to have the wife enter the United States. Id. at 406. After the wife received her visa, the husband became suspicious of her reasons for marrying him. Ibid. However,

11

the husband proceeded to marry the wife in a religious ceremony in India despite his suspicions. Id. at 406-07. In requesting an annulment, the husband claimed the wife married him for the sole purpose of entering the United States. Id. at 408.

The party seeking an annulment "always bears the burden of proof." Ibid. As the judge stated in Patel: "To entitle an applicant to an annulment, the proof must be by clear and convincing evidence and not subject to the availability of other inferences. This rule is equally applicable to the fraud as to the essentials of the marriage as well as its existence prior to the marriage." Ibid. (citation omitted). The judge concluded:

> [T]he fraud, alleged to exist in this case, is not the type contemplated by our law sufficient in degree to annul a marriage. Nothing on the record in this case suggest that the [wife] was unwilling to act as a wife to the [husband] nor that she did not want to create for herself the status of wife.
>
> [Id. at 410.]

The judge further explained, "[i]t was incumbent upon [the] plaintiff to conduct further investigation after being placed on notice of any alleged impediments" prior to the marriage. Id. at 411.

The facts in Patel are similar to the facts in this matter. Here, plaintiff identified multiple "red flags" regarding his marriage to defendant prior to their

engagement, during their engagement, before their civil ceremony, and before their religious ceremony. Plaintiff had ample opportunity to investigate the various "red flags." However, plaintiff elected not to investigate or take any action with respect to the "red flags," and proceeded to marry defendant twice.

Plaintiff's reliance on Faustin v. Lewis, 85 N.J. 507 (1981), is misplaced. In that case, the plaintiff and the defendant knowingly agreed to marry for the sole purpose of rendering the plaintiff eligible for permanent residence status in the United States. Id. at 509. Apparently, the defendant married other Haitian citizens for a fee to obtain permanent residence in the United States. Ibid.[2] Because both parties participated in the fraudulent marriage in Faustin, our Supreme Court relied on the "lack of mutual assent to the marital relationship" to sustain the annulment under N.J.S.A. 2A:34-1(d). Id. at 510.

In Faustin, the Court found "neither of the parties intended to marry, nor did they thereafter enter into any kind of marital relationship with each other." Ibid. Therefore, the Court stated that if the plaintiff's allegations were proven, she could "establish a ground for judgment of nullity of her marriage." Id. at

_____

[2] A federal grand jury indicted the defendant on criminal charges for "unlawfully assisting Haitian aliens to fraudulently obtain permanent residence in the United States in violation of the immigration and naturalization laws." Ibid.

A-3448-23

510-11. The issue before the Court in <u>Faustin</u> was "whether [the plaintiff] should be barred from judicial relief because of her participation in a sham marriage."

The facts before this court are distinguishable. In his verified complaint, plaintiff specifically alleged "fraud as to the essentials of the marriage," rather than lack of mutual assent to the marriage under N.J.S.A. 2A:34-1(d). Even if we agreed plaintiff asserted a claim for annulment based on lack of mutual assent to the marital relationship, which we do not, the testimony proffered on plaintiff's behalf demonstrated the parties intended to marry. Moreover, Bekka, the friend who spent time visiting with plaintiff and defendant in Canada and the United States, testified the pair displayed behaviors indicative of a newly married couple.

We also reject plaintiff's argument that the failure to consummate the marriage warranted an annulment. Failure to consummate the marriage is not an independent ground for an annulment under N.J.S.A. 2:34-1.

Whether or not plaintiff consummated the marriage, he nonetheless ratified the marriage, rendering N.J.S.A. 2A:34-1(d) inapplicable. Once a party to a fraudulently induced marriage discovers the fraud or learns facts from which knowledge of the fraud may be imputed, the party affirms or ratifies the marriage

14

by voluntarily continuing to cohabitate "with full knowledge of the invalidating facts." Avakian v. Avakian, 69 N.J. Eq. 89, 112 (Ch. 1905). See also Fromm v. Huhn, 95 N.J. Eq. 728, 730 (1924) (finding husband ratified the marriage after learning wife had a secret living husband but "continued to live with her as her husband").

Here, after plaintiff identified "red flags" evidencing defendant's purported fraud, he ratified the marriage. Not only did plaintiff remain in the marriage, but he continued to live with defendant and held himself out as defendant's husband until the couple separated in September 2022.

Having reviewed the record, plaintiff failed to prove "fraud as to the essentials of marriage," N.J.S.A. 2A:34-1(d), to warrant annulment of the marriage. The case law is clear, a bad bargain under a marriage contract is insufficient as a matter of law to dissolve a marriage whether consummated or not. Woodward, 97 N.J. Eq. at 258. A mistake in marrying an individual who may misrepresent their "character, fortune, health, and the like" does not nullify a marriage. Rhoades, 10 N.J. Super. at 438. We are satisfied plaintiff's proofs, at best, demonstrated disappointment in discovering he did not marry a person possessing similar character, custom, and belief, which is insufficient to sustain a cause of action for annulment.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3448-23